Opinion by Judge KLEINFELD; Concurrence by Judge SILVERMAN; Partial Concurrence and Partial Dissent by Judge GRÁBER.
OPINION
KLEINFELD, Circuit Judge:
A majority of the court has concluded that the plaintiffs have standing. A separate majority, for differing reasons, affirms the district court’s dismissal of the plaintiffs’ claim.
Parts I and II of this opinion are joined by Judges THOMAS, SILVERMAN, CLIFTON, BYBEE, and IKUTA. Part III of this opinion, addressing the merits of the plaintiffs’ claim, is a dissent, joined by Judges BYBEE and IKUTA. Five of us, including Chief Judge KOZINSKI and Judges RYMER, HAWKINS, and McKEOWN, conclude that the plaintiffs have no standing, as set forth in Judge GRABER’s opinion. Three of us, including Judges THOMAS and CLIFTON, concur in the judgment, concluding that although the plaintiffs do have standing, their claim fails on the merits, as set forth in Judge SILVERMAN’S opinion.
I. Facts[1]
We address whether Catholics and a Catholic advocacy group in San Francis *1047 co may sue the City on account of an official resolution denouncing their church and doctrines of their religion. They may.
Pope Paul III established the Congregation for the Doctrine of the Faith a half millennium ago.[2] It safeguards and promotes Catholic doctrine on faith and morals. In 2003, the Congregation addressed homosexual marriage and adoption, concluding that both were immoral, and that it was the moral duty of Catholics to oppose both. To carry out this doctrinal decision, Cardinal William Joseph Levada directed the Archdiocese of San Francisco that Catholic agencies should not place children for adoption in homosexual households.
San Francisco immediately responded with official hostility. The San Francisco Board of Supervisors adopted the resolution giving rise to this lawsuit. The resolution urges the Cardinal to withdraw his instructions; denounces the Cardinal’s directive as “meddl[ing]” by a “foreign country”; calls it “hateful,” “insulting,” and “callous”; and urges the local archbishop and Catholic Charities to “defy” the Cardinal’s instructions. Here is Resolution 168-06 in full:
Resolution urging Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican, to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.
WHEREAS, It is an insult to all San Franciscans when a foreign country, like the Vatican, meddles with and attempts to negatively influence this great City’s existing and established customs and traditions such as the right of same-sex couples to adopt and care for children in need; and
WHEREAS, The statements of Cardinal Levada and the Vatican that “Catholic agencies should not place children for adoption in homosexual households,” and “Allowing children to be adopted by persons living in such unions would actually mean doing violence to these children” are absolutely unacceptable to the citizenry of San Francisco; and
WHEREAS, Such hateful and discriminatory rhetoric is both insulting and callous, and shows a level of insensitivity and ignorance which has seldom been encountered by this Board of Supervisors; and
WHEREAS, Same-sex couples are just as qualified to be parents as are heterosexual couples; and
WHEREAS, Cardinal Levada is a decidedly unqualified representative of his former home city, and of the people of San Francisco and the values they hold dear; and
WHEREAS, The Board of Supervisors urges Archbishop Niederauer and the Catholic Charities of the Archdiocese of San Francisco to defy all discriminatory directives of Cardinal Levada; now, therefore, be it
RESOLVED, That the Board of Supervisors urges Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican (formerly known as Holy Office of the Inquisition), to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.[3]
Plaintiffs sued the City, claiming that this official government resolution violates *1048 the Establishment Clause. The district court dismissed their lawsuit for failure to state a claim upon which relief could be granted, and we initially affirmed.[4] We then voted to rehear the case en banc, and now affirm the district court’s dismissal on differing grounds.
II. Standing
The complaint alleges that plaintiffs are a Catholic civil rights organization and two devout Catholics who live in San Francisco. They aver that the resolution conveys a government message of disapproval and hostility toward their religious beliefs. It “sends a clear message,” they plead, “that they are outsiders, not full members of the political community.” They allege that they have been injured by “misuse of the instruments of government to criticize, demean and attack their religion and religious beliefs, thereby chilling their access to the government.” The individual plaintiffs aver that they “will curtail their activities to lessen their contact” with the city and county government, and the two members of the Board of Supervisors sued because of the resolution.
After raising the question of standing sua sponte, we asked the parties for letter briefs addressing it. The City and County conceded standing, arguing that “the individual plaintiffs have successfully pleaded standing, having alleged that they are members of the community who have had contact with the resolution and have suffered spiritual harm as a result.” Were the result otherwise, the municipality concedes, a resolution declaring Catholicism to be the official religion of the municipality would be effectively unchallengeable. The municipality also concedes that the Catholic League has “associational standing.”
“At bottom, ‘the gist of the question of standing’ is whether petitioners have ‘such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.’ ”[5] Had a Protestant in Pasadena brought this suit, he would not have had standing. Catholics in San Francisco, on the other hand, have sufficient interest, so that well-established standing doctrine entitles them to litigate whether an anti-Catholic resolution violates the Establishment Clause. Standing, or the lack of it, may be intertwined with whether the complaint states a claim upon which relief can be granted, but it is not the same thing.[6] Standing is not about who wins the lawsuit; it is about who is allowed to have their ease heard in court. It would be outrageous if the government of San Francisco could condemn the religion of its Catholic citizens, yet those citizens could not defend themselves in court against their government’s preferment of other religious views.
Nevertheless, some of us have dissented on standing, so we address the issue. The standing question, in plain English, is whether adherents to a religion have standing to challenge an official condemnation by their government of their religious views, and official urging by their government that their local religious representa *1049 tive defy their church. Their “personal stake” assures the “concrete adverseness” required. “Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message.”[7] Plaintiffs aver that not only does the resolution make them feel like second-class citizens, but that their participation in the political community will be chilled by the City’s hostility to their church and their religion.
The constitutional requirement of standing has three elements: (1) the plaintiff must have suffered an injury-in-fact— that is, a concrete and particularized invasion of a legally protected interest that is actual or imminent, not conjectural or hypothetical; (2) the injury must be causally connected — that is, fairly traceable— to the challenged action of the defendant and not the result of the independent action of a third party not before the court; and (3) it must be likely and not merely speculative that the injury will be redressed by a favorable decision by the court.[8] “The concept of a ‘concrete’ injury is particularly elusive in the Establishment Clause context ... because the Establishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature.”[9]
It is, of course, incumbent upon the courts to apply standing doctrine neutrally, so that it does not become a vehicle for allowing claims by favored litigants and disallowing disfavored claimants from even getting their claims considered. Without neutrality, the courts themselves can become accessories to unconstitutional endorsement or disparagement. Standing is emphatically not a doctrine for shutting the courthouse door to those whose causes we do not like. Nor can standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true.
Standing was adequate for jurisdiction in Establishment Clause cases in the Supreme Court in the following contexts: prayer at a football game,[10] a creche in a county courthouse[11] or public park,[12] the Ten Commandments displayed on the grounds of a state capitol[13] or at a courthouse,[14] a cross display at a national park,[15] school prayer,[16] a moment of si *1050 lence at school,[17] Bible reading at public school,[18] and a religious invocation at a graduation.[19] No one was made to pray, or to pray in someone else’s church, or to support someone else’s church, or limited in how they prayed on their own, or made to worship, or prohibited from worshiping, in any of these cases. The Court treated standing (and therefore the concreteness element of standing) as sufficient in all of these cases, even though nothing was affected but the religious or irreligious sentiments of the plaintiffs.[20]
We have concluded that standing was established in cases involving displaying crosses on government land,[21] removing a cross from a city seal,[22] disciplining physicians who performed surgery without blood transfusions in a lawsuit by Jehovah’s Witnesses,[23] including the words “under God” in the Pledge of Allegiance,[24] and contracting with the Boy Scouts to administer a city recreational facility.[25] The harm to the plaintiffs in those cases was spiritual or psychological harm.[26] That is *1051 the harm plaintiffs claim here. If we conclude that plaintiffs in the case before us have standing, we need not decide whether those cases retain their vitality or are overruled, because our conclusion would be consistent with them. But if we reject standing for plaintiffs in this case, then those cases must somehow be distinguished convincingly (a difficult task), or overruled.
The leading Supreme Court Establishment Clause case for the absence of Establishment Clause standing is Valley Forge Christian College v. Americans United for Separation of Church and State,[27] The government had conveyed surplus property to a religious college, for free, subject to a condition subsequent requiring use for thirty years solely as an educational institution.[28] The plaintiffs sued because the college was avowedly and plainly a sectarian Christian institution that would operate for sectarian Christian purposes. The Court held that Americans United lacked standing, not only for a taxpayers suit under Flast v. Cohen[29] but also as individuals and a group affected by government action respecting an establishment of religion.[30] The reason they lacked the concrete injury necessary for standing was that, regardless of whether the government action violated the Establishment Clause, they had no concrete injury beyond the offense to their desire to have the government conform to the Constitution.[31] “They fail[ed] to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees.”[32] These plaintiffs *1052 were like the Protestants in Pasadena suing San Francisco over its anti-Catholic resolution.
One has to read the whole Valley Forge sentence quoted, and not stop at “psychological consequence,” to understand it. A “psychological consequence” does not suffice as concrete harm where it is produced merely by “observation of conduct with which one disagrees.” But it does constitute concrete harm where the “psychological consequence” is produced by government condemnation of one’s own religion or endorsement of another’s in one’s own community. For example, in the school prayer and football game cases, nothing bad happened to the students except a psychological feeling of being excluded. Likewise in the creche and Ten Commandments cases, nothing happened to the non-Christians, or to people who disagreed with the Ten Commandments or their religious basis, except psychological consequences. What distinguishes the cases is that in Valley Forge, the psychological consequence was merely disagreement with the government, but in the others, for which the Court identified a sufficiently concrete injury, the psychological consequence was exclusion or denigration on a religious basis within the political community.[33]
Plaintiffs allege that they are directly stigmatized by San Francisco’s actions. They allege that the stigmatizing resolution leaves them feeling like second-class citizens of the San Francisco political community, and expresses to the citizenry of San Francisco that they are. The cause of the plaintiffs’ injury here is not speculative: it is the resolution itself. Plaintiffs allege that their “Sacred Scripture” “presents homosexual acts as acts of grave depravity,” and that “Catholic tradition has always declared that homosexual acts are intrinsically disordered.” Plaintiffs believe *1053 as part of their religion that “Catholics have an obligation to state clearly the immoral nature of homosexual unions so as to safeguard public morality, and above all, to avoid exposing young people to erroneous ideas about sexuality and marriage. Clear and emphatic opposition to homosexual unions is a duty of all Catholics.” San Francisco directly disparages these religious beliefs through its resolution by calling them “hateful and discriminatory,” “insulting and callous,” and “insensitiv[e] and ignoran[t].”
The concreteness of injury is sufficiently pleaded here because plaintiffs aver that: (1) they live in San Francisco; (2) they are Catholics; (3) they have come in contact with the resolution; (4) the resolution conveys a government message of disapproval and hostility toward their religious beliefs; that (5) “sends a clear message” “that they are outsiders, not full members of the political community”; (6) “thereby chilling their access to the government”; and (7) forcing them to curtail them political activities to lessen their contact with defendants.
Standing also requires redressability, that is, that it is “likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.”[34] Plaintiffs seek a declaratory judgment that the resolution is unconstitutional, and nom-
inal damages for the violation of their rights. By declaring the resolution unconstitutional, the official act of the government becomes null and void.[35] Even more important, a declaratory judgment would communicate to the people of the plaintiffs’ community that their government is constitutionally prohibited from condemning the plaintiffs’ religion, and that any such condemnation is itself to be condemned. This would reaffirm the fundamental principle that
[t]he basic purpose of the religion clause of the First Amendment is to promote and assure the fullest possible scope of religious liberty and tolerance for all and to nurture the conditions which secure the best hope of attainment of that end.
The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief.[36]
III. Merits
I dissent with regard to the merits of the Board’s resolution.
“The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person’s standing in the political community.”[37] Government runs afoul of the Establish-
*1054 ment Clause through “endorsement or disapproval of religion. Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message.”[38] Plaintiffs complain here of just such governmental disparagement of their religion.
We have not found another Establishment Clause case brought by people whose religion was directly condemned by their government. Though there have been lapses, as with Mormons and Jehovah’s Witnesses, tradition even more than law has generally restrained our national, state, and local governments from expressing condemnation or disrespect for anyone’s religion. George Washington set the tone for our governmental relationship to religion even before the First Amendment was ratified, in his 1790 expression of goodwill to the Hebrew Congregation in Newport, Rhode Island:
All possess alike liberty of conscience and immunities of citizenship. It is now no more that toleration is spoken of, as if it was by the indulgence of one class of people, that another enjoyed the exercise of their inherent natural rights. For happily the government of the United States, which gives to bigotry no sanction, to persecution no assistance, requires only that they who live under its protection should demean themselves as good citizens, in giving it on all occasions their effectual support.[39]
The only recent Court decision on government hostility to a particular religion that we have found is the free exercise decision of Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, where the Court notes that its Establishment Clause cases “have often stated the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general.”[40] That case, along with many other opinions of the Court, stands for the principle that government has no legitimate role under the Establishment Clause in judging the religious beliefs of the people — either by praise or denunciation.[41] This principle requires that we nullify San Francisco’s governmental condemnation of Catholic doctrine. Though much criticized,[42] Lemon v. *1055 Kurtzmcm[43] remains controlling on Establishment Clause violations, subject to subsequent emendations as the “endorsement” and “neutrality” principles have developed.[44] Under Lemon, government action must have a secular purpose, “its principal or primary effect must be one that neither advances nor inhibits religion,” and it “must not foster excessive entanglement with religion.”[45]
The municipality argues that its purpose was not to condemn Catholicism, but rather to foster equal treatment of people who are gay and lesbian. That is indeed a legitimate purpose, but we would not have this case before us if that were all that the resolution said. The San Francisco government would face no colorable Establishment Clause challenge had they limited their resolution to its fourth “whereas,” that “[s]ame sex couples are just as qualified to be parents as heterosexual couples.” San Francisco is entitled to take that position and express it even though Catholics may disagree as a matter of religious faith. But the title paragraph, the other five “whereas” clauses, and the “resolved” language are all about the Catholic Church, not same-sex couples.
The municipality argues that any reasonable recipient of its message would also be familiar with its forty-one other resolutions condemning discrimination against homosexuals and anti-homosexual speech in Russia,[46] Germany,[47] Florida,[48] Alabama,[49] by a senator from another state,[50] by various celebrities,[51] and by a football team.[52] The municipality claims that these show that its concern is homosexuals, not Catholicism, and that any inference of anti-Catholicism is decisively rebutted because anyone would know that the councilman *1056 who introduced the resolution is Catholic. The argument seems bizarre. Why would anyone know the personal religious faith of each city councilman? Or be familiar with all the resolutions of their municipal government, not just the one attacking then-church? And why should the underlying secular motive inferable from other government actions cure an expressed anti-Catholic purpose in the action challenged? Regardless of what the underlying motivation may be for the various individuals on the city council, a court must, in deciding whether a government action violates the Establishment Clause, read the. words of the government enactment.[53] If the zoning board prohibited all synagogues and mosques from operating within the city limits, the action would not be saved even by a legislative history that persuasively demonstrated a secular motive of avoiding strife between Jews and Muslims. “[Ojfficial objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter’s heart of hearts.”[54] “[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect.”[55]
The resolution also must satisfy the second prong of the Lemon test, that its “principal or primary effect must be one that neither advances nor inhibits religion ....”[56] Here, the argument seems to be that the resolution has no effect at all, let alone a “principal or primary” one, because it is merely an ineffectual expression of the Board of Supervisors’ sentiment and not a compulsory regulation of behavior. That argument cannot stand because of the extensive Establishment Clause jurisprudence where government, arguably with similar ineffectuality, endorses religion, and the mere endorsement is deemed unconstitutional.[57]
*1057 The “effect” prong of the Lemon test “asks whether, irrespective of the government’s actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.”[58] That is to say, a mere message of disapproval, even in the absence of any coercion, suffices for an Establishment Clause violation under Lemon. If the government action conveys a message of disapproval of religion, then it violates the Establishment Clause.[59] The “message” in the resolution, unlike, say, the message that might be inferred from some symbolic display, is explicit: a Catholic doctrine duly communicated by the part of the Catholic church in charge of clarifying doctrine is “hateful,” “defamatory,” “insulting,” “callous,” and “discriminatory,” showing “insensitivity and ignorance,” the Catholic Church is a hateful foreign meddler in San Francisco’s affairs, the Catholic Church ought to “withdraw” its religious directive, and the local archbishop should defy his superior’s directive. This is indeed a “message of ... disapproval.” And that is all it takes for it to be unconstitutional.[60]
As for entanglement, the resolution explicitly entangles itself in church governance. The City would entangle itself with judicial hierarchy, albeit not unconstitutionally, by urging a district judge to defy the court of appeals. And San Francisco entangles itself with the Catholic hierarchy when it urges the local archbishop to defy the cardinal. It is a dramatic entanglement to resolve that the Cardinal “as head of the Congregation for the Doctrine of the Faith” should withdraw his directive. The Catholic Church, like the myriad other religions that have adherents in San Francisco, is entitled to develop and propagate its faith without assistance and direction from government.[61] If the faith leads to actions contrary to San Francisco policy, like not placing children for adoption with homosexual couples, the city may abjure use of its institutions to place children, but it may not entangle itself with development of Catholic religious doctrine.[62] The half-millennium-old Congre *1058 gation for the Doctrine of the Faith is entitled, under our Constitution, to develop religious doctrine free of governmental interference.
Lemon requires government to satisfy all three prongs to avoid an Establishment Clause violation.[63] Even if we were to conclude that San Francisco satisfied one or two of them, it would not satisfy all three. “What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion.”[64] Messages of endorsement or disapproval “make religion relevant, in reality or public perception, to status in the political community.” [65] It is an “established principle that the government must pursue a course of complete neutrality toward religion.”[66] The “[Establishment] Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from ‘making adherence to a religion relevant in any way to a person’s standing in the political community.’ ”[67]
The Establishment Clause might arguably have been limited, long ago, to prohibiting something like the Church of England, where taxes support the church and the government appoints its head, the Archbishop of Canterbury. Or the clause might have been limited to laws imposing fines for failure to attend church at proper times.[68] But it has not been so limited. The Establishment Clause as it has developed may be violated even by government action that is no more than expression of a sentiment, as by displays of religious symbols on government property. None of these violations compel anyone to do anything or refrain from anything, but they are the usual subjects of Establishment Clause prohibition. The Court has assiduously avoided limiting its doctrines to endorsement, by saying “endorsement or disapproval,”[69] so disapproval is as much a violation as endorsement. For the govern *1059 ment to resolve officially that “Catholic doctrine is wrong,” is as plainly violative of the Establishment Clause as for the government to resolve that “Catholic doctrine is right.”
No practical or fair reading could construe the Establishment Clause as prohibiting only government endorsement and not government condemnation of religion. Though it is hard to imagine that government condemnation of the Catholic Church would generate a pogrom against Catholics as it might at another time or for a religion with fewer and more defenseless adherents, the risk of serious consequences cannot be disregarded.[70] Vandals might be emboldened by knowledge that their government agrees that the Catholic Church is hateful and discriminatory. Parishioners might be concerned about driving their car to Mass for fear that it might be keyed in the parking lot. Zoning officials might be emboldened to deny variances and building permits on grounds they might not apply to other churches. Catholic city employees might fear for their promotions if they show too much religiosity, as by coming to work on Ash Wednesday with ash crosses on their foreheads. There are very good reasons why the Constitution directs government to stay out of religious matters.
Our Founding Fathers were well aware of the strife in Europe during the Thirty Years War, and in England in the English Revolution, over religion. They put together a nation of Protestants of various disagreeing sects, Catholics, and Jews, by excluding government from religion. The exclusion was not anticlerical, and did not invite government hostility to any church. Our revolution, unlike the French, Mexican, or Russian revolutions, had no element of anticlericalism. Our Bill of Rights established freedom of religion, not hostility to or establishment of any religion.
The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.
If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens by word or act their faith therein.[71]
Yet the San Francisco Board of Supervisors took upon itself authority to “prescribe what shall be orthodox” in Catholic doctrine. Government cannot constitutionally prescribe a religious orthodoxy and condemn heresy on homosexuality, or anything else. “[NJeither Pagan nor Mahometan, nor Jew, ought to be excluded from the civil rights of the commonwealth because of his religion.”[72] America allows *1060 both loyalty to faith and first-class citizenship.
IV. Conclusion
Although three of us would reverse, a majority of this court concludes that we should affirm, either on standing grounds or on the merits. Accordingly, the judgment of the district court is AFFIRMED.

. Because the complaint was dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief could be granted, we take the factual allegations from the complaint to determine whether, if proved, they would establish a claim. Sacks v. Office of Foreign Assets Control, 466 F.3d 764, 771 (9th Cir.2006). We therefore state the facts as pleaded.

. 1542, 468 years ago.

. S.F. Res. No. 168-06 (Mar. 21, 2006), available at http://www.sfbos.org/ftp/uploadedfiles/ bdsupvrs/resolutions06/r0168-06 .pdf.

. Catholic League for Religious and Civil Rights v. San Francisco, 567 F.3d 595 (9th Cir.2009), reh’g en banc granted 586 F.3d 1166 (9th Cir.2009).

. See Massachusetts v. EPA, 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

.Cf. Reed Elsevier, Inc. v. Muchnick,-U.S. -, 130 S.Ct 1237, 1244, 176 L.Ed.2d 17 (2010); Arbaugh v. Y & H Corp., 546 U.S. 500, 511-12, 126 S.Ct 1235, 163 L.Ed.2d 1097 (2006).

. Lynch v. Donnelly, 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring); see also Cnty. of Allegheny v. ACLU, 492 U.S. 573, 595, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (adopting Justice O'Connor's rationale in Lynch).

. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 475-76, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

. Vasquez v. Los Angeles Cnty., 487 F.3d 1246, 1250 (9th Cir.2007).

. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 313-14, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000).

. Cnty. of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

. Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

. Van Orden v. Perry, 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005).

. McCreary Cnty. v. ACLU of Ky., 545 U.S. 844, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005).

. Salazar v. Buono, -U.S.-, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010).

. Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

. Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

. Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

. Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

. Judge Graber’s argument appears to be that since this case does not involve a challenge to a religious display on government property, a religious exercise at a public ceremony, or a “specific governmental policy or statutory provision,” there is no standing. There is not a single standing case that limits Establishment Clause standing to these three categories. Most of the cases fall into them because American governments have typically been sympathetic to religion rather than hostile to it. Establishment Clause challenges, because of this typical governmental sympathy for religion, tend to challenge governmental endorsement. The Supreme Court, though, has carefully linked rejection of endorsements to rejection of condemnations in virtually every discussion of the subject. See, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1992) (”[T]he First Amendment forbids an official purpose to disapprove of a particular religion.... ”). Moreover, an official resolution of the City of San Francisco is indeed a ”case[] involving a specific governmental policy,” condemning, in this case, the Catholic Church. The distinction Judge Graber draws between a governmental display and a government’s official resolution cuts against her view. A symbol such as a creche on the city hall lawn is ambiguous. It may mean that the government endorses Christianity, or it may mean that the government merely wishes to show respect and friendship for Christianity. The resolution at issue, like a symbol, conveys a message, but unlike a symbol, the message is unambiguous. Judge Graber’s opinion would ignore San Francisco’s plain denunciation of the Catholic Church because it is unaccompanied by symbolic public art. The opinion also ignores binding Supreme Court precedent on government speech: "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.... This does not mean that there are no restraints on government speech. For example, government speech must comport with the Establishment Clause.” Pleasant Grove City v. Summum, —• U.S. -, 129 S.Ct. 1125, 1131-32, 172 L.Ed.2d 853 (2009).

. Buono v. Norton, 371 F.3d 543 (9th Cir. 2004); Separation of Church & State Comm. v. City of Eugene, 93 F.3d 617, 619 n. 2 (9th Cir. 1996) (per curiam).

. Vasquez v. Los Angeles Cnty., 487 F.3d 1246, 1250 (9th Cir.2007).

. Graham v. Deukmejian, 713 F.2d 518, 519 (9th Cir. 1983).

. Newdow v. Rio Linda Union Sch. Dist., 597 F.3d 1007 (9th Cir.2010).

. Barnes-Wallace v. City of San Diego, 530 F.3d 776 (9th Cir.2008).

. Judge Graber cites many, many standing cases and faults us for not discussing all of them to the same extent. The reason why all need not be patiently explicated is that not a single one of Judge Graber's cited cases involves a government condemnation of a par *1051 ticular church or religion. The attempt to tease out of the rhetoric explaining the holdings in other, quite different, factual circumstances fails because the language in every case explained a different result. True, there are so many Establishment Clause standing cases that the language (as opposed to the holdings) in some furnishes ammunition for Judge Graber's view. Newdow v. Lefevre upholds standing to challenge federal statutes requiring “In God We Trust” on currency, but not the federal statute making “In God We Trust” the national motto. 598 F.3d 638, 642 (9th Cir.2010). Newdow v. Rio Linda Union School District has dicta that a parent and child lacked standing to challenge the federal statute adding “under God” to the pledge of allegiance, but holds that they had standing to challenge the California law requiring the pledge’s recitation in the schools even though no child was required to recite it. 597 F.3d 1007, 1016 (9th Cir.2010). Judge Graber’s stretch from federal statutes regarding traditional patriotic formulas that include vague and general religiosity, to a local ordinance condemning the church and religious views of some of the municipality’s residents, takes the explanatory language of these cases too far. Additionally, Judge Graber argues that a one-page Eighth Circuit per curiam opinion, Flora v. White, is "indistinguishable” from this case. 692 F.2d 53 (8th Cir. 1982) (per curiam). Hardly. The Eighth Circuit held that the plaintiffs lacked standing to challenge a provision in the Arkansas Constitution making atheists incapable of holding public office or to testify as a witness, where the plaintiffs had no plans to do either. Id. at 54. Their being offended because they were atheists was analogized to the plaintiffs offended but not affected in Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). See Flora, 692 F.2d at 54. Unlike either of these cases, the plaintiffs here are not suing on the mere principle of disagreeing with San Francisco, but because of that city’s direct attack and disparagement of their religion.

. 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

. Id. at 468, 102 S.Ct. 752.

. 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

. Valley Forge, 454 U.S. at 479-80, 485-86, 102 S.Ct. 752.

. Id. at 485-86, 102 S.Ct. 752.

. Id. at 485, 102 S.Ct. 752.

. Judge Graber argues that standing is appropriate in the religious display cases, but not this case of condemnation of a religion, because those who challenge a religious display have frequent or regular contact with it and are harmed because they cannot freely use public areas. This distinction cuts the other way, however, as explained above. Living in a city that condemns one’s religion is a daily experience of contact with a government that officially condemns one’s religion. A plaintiff's having visual contact with a cross is immaterial, and would not raise a question if it were merely in a painting in the city art museum, because a reasonable person would not infer a government's position on a religion from the painting. The ‘'contact” that matters is in the mind — acquisition of the knowledge that the government endorses (or condemns) a religion. An official government condemnation of a religion unambiguously and inescapably conveys knowledge of that condemnation. Judge Graber’s notion that the public display cases involve restriction on movement relies on a false factual proposition. In none of the religious display cases is there any law prohibiting free use of public areas by those who are not adherents to the religion. The nonadherents simply feel uncomfortable in the presence of a display endorsing someone else’s religion. There is no principled basis for assiduously addressing that discomfort, yet treating as trivial the discomfort of those whose religion is condemned by their government. The plaintiffs are as affected by what the San Francisco government has done — condemning their religion'— as an atheist would be if the San Francisco government erected a giant cross on top of its biggest hill, on which he happened to live and which he would be walking past on the way to work. The government cannot constitutionally endorse a religion by erecting the cross; nor, analogously, can it condemn religion by erecting a gigantic sign on city hall of a cross with a line through it: a “no Christianity” sign with the design of a “no smoking” sign. The Board's resolution accomplishes the same thing as the aforementioned sign, but even more plainly and unambiguously. Symbols endorsed or adopted by a government are often ambiguous, but the words in this resolution are not. Consequently, this is an easier and more direct case for standing than any of the religious-symbolism cases cited by Judge Graber.

. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted).

. See, e.g., Powell v. McCormack, 395 U.S. 486, 506, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (" ‘Especially is it competent and proper for this court to consider whether its (the legislature's) proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void.’ ” (quoting ‘‘language which time has not dimmed” from Kilbourn v. Thompson, 103 U.S. 168, 199, 26 L.Ed. 377 (1880))).

. Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 305, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring) (emphasis added), quoted with approval in Larson v. Valente, 456 U.S. 228, 246, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982).

. Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring); see also Cnty. of Allegheny v. *1054 ACLU, 492 U.S. 573, 595, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (adopting Justice O’Connor's rationale in Lynch).

. Lynch, 465 U.S. at 688, 104 S.Ct. 1355 (O'Connor, J., concurring).

. Critical Documents of Jewish History 3 (Ronald H. Isaacs & Kerry M. Olitzky eds. 1995).

. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1992) (citing six cases).

. See, e.g., Lynch, 465 U.S. at 673, 104 S.Ct. 1355 ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." (emphasis added)).

.See, e.g., Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet, 512 U.S. 687, 720, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (O’Con-nor, J., concurring) (warning that "the bad test may drive out the good. Rather than taking the opportunity to derive narrower, more precise tests from the case law, courts tend to continually try to patch up the broad test, making it more and more amorphous and distorted. This, I am afraid, has happened with Lemon ”); Lamb’s Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 399, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring) (lamenting that "[l]ike some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, Lemon stalks our Establishment Clause juris prudence once again, frightening the little children and school attorneys....” And detailing how "[o]ver the years ... no fewer than five of the [then] sitting Justices have, in *1055 their own opinions, personally driven pencils through the creature's heart (the author of today's opinion repeatedly), and a sixth has joined an opinion doing so”); Cnty. of Allegheny v. ACLU, 492 U.S. 573, 669, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Kennedy, concurring in part) (expressing his view "that the endorsement test is flawed in its fundamentals and unworkable in practice”); Comm, for Pub. Ed. v. Regan, 444 U.S. 646, 671, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (Stevens, J. dissenting) (explaining that the Court should abandon "the sisyphean task of trying to patch together the 'blurred, indistinct, and variable barrier' described in Lemon ")

. 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

. See Lamb's Chapel, 508 U.S. at 395 n. 7, 113 S.Ct. 2141 (stating, in response to Justice Scalia’s assertion that Lemon was a "ghoul in a late-night horror movie,” that "there is a proper way to inter an established decision and Lemon, however frightening it might be to some, has not been overruled”).

. Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105.

. S.F. Res. No. 364-06 (June 13, 2006), available at http://www.sfbos.org/ftp/ uploadedfiles/bdsupvrs/resolutions06/r036406.pdf.

. S.F. Res. No. 220-00 (Mar. 13, 2000), available at http://www.sfbos.org/ftp/ uploadedfiles/bdsupvrs/resolutions00/r022000.pdf.

. S.F. Res. No. 73-05 (Jan. 25, 2005), available at http://www.sfbos.org/ftp/uploadedfiles/ bdsupvrs/resolutions05/r0073-05 .pdf.

. S.F. Res. No. 234-99; see Am. Family Ass’n v. City & Cnty. of San Francisco, 277 F.3d 1114, 1119 (9th Cir.2002).

. S.F. Res. No. 308-03 (May 6, 2003), available at http://www.sfbos.org/ftp/uploadedfiles/ bdsupvrs/resolutions03/r0308-03.pdf.

. See, e.g., S.F. Res. No. 199-00 (Mar. 6, 2000), available at http://www.sfbos.org/ftp/ uploadedfiles/bdsupvrs/resolutionsOO/rO 199— 00.pdf.

. S.F. Res. No. 454-05 (June 14, 2005), available at http://www.sfbos.org/ftp/ uploadedfiles/bdsupvrs/resolutions05/r045405.pdf.

.Judge Silverman suggests that the resolution should be read in the context of San Francisco's history of promoting gay rights and supporting the rights of same-sex couples. A strong city policy of favoring gay rights, though, does not justify official attacks on religion. The San Francisco government used the group version of an ad hominem argument. Instead of a resolution simply favoring same-sex adoption and criticizing the arguments against it, the resolution attacked the religion of those against it. A secular motive for smearing anti-Catholic graffiti on a cathedral would not erase the anti-Catholic message conveyed. The Board of Supervisors went out of its way to characterize Catholicism as coming from a "foreign country[:] the Vatican,” its teachings as "hateful,” and implicitly compared modern-day Catholic officials to the Inquisition. These are traditional anti-Catholic tropes employed for centuries by anti-Catholic bigots. See, e.g., Thomas E. Watson, Rome's Law, Or Our’s — Which?, The Jeffersonian, Sept. 7, 1916, at 4 (using the same rhetorical device as the Board of Supervisors, Tom Watson, the Populist supporter of the Ku Klux Klan, characterized Catholic religious convictions as "laws of [a] foreigner [that] are absolutely antagonistic to ours.... The Pope's is the only church that is foreign; the only church whose laws antagonize democracy and republican institutions ...; the only church whose theology teaches murder, and whose literature is so obscene that she savagely prosecutes [those] who expose it”).

. McCreary Cnty. v. ACLU of Ky., 545 U.S. 844, 862, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005).

. Int’l Union, United Auto., Aerospace & Agrie. Implement Workers of Am. v. Johnson Controls, Inc., 499 U.S. 187, 199, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991).

. Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

. See, e.g., McCreary Cnty., 545 U.S. at 844, 125 S.Ct. 2722 (display of Ten Commandments); Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (prayer before football game); Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (religious invocation at school graduation); Cnty. of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (creche display at a courthouse); Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (moment of *1057 silence or voluntary prayer at school); Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Bible reading at school); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (prayer at school); Buono v. Norton, 371 F.3d 543 (9th Cir.2004) (cross on public land); Separation of Church & State Comm. v. City of Eugene, 93 F.3d 617 (9th Cir. 1996) (same); Graham v. Deukmejian, 713 F.2d 518 (9th Cir. 1983) (disciplining physicians who performed surgery in accord with religious beliefs); see also Pleasant Grove City v. Summum, - U.S. -, 129 S.Ct. 1125, 1139, 172 L.Ed.2d 853 (2009) (Stevens, J., concurring) (suggesting that even though government expression is not impeded by the Free Speech Clause, "government speakers are bound by the Constitution's other proscriptions, including those supplied by the Establishment and Equal Protection Clauses”).

.Lynch v. Donnelly, 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O’Connor, J., concurring) (Justice O’Connor’s rationale was later adopted by the Court in Wallace, 472 U.S. at 56, 105 S.Ct. 2479).

. Id.

. Id.

. See Cnty. of Allegheny, 492 U.S. at 590, 109 S.Ct. 3086 ("[T]oday [the Establishment and Free Exercise Clauses] are recognized as guaranteeing religious liberty and equality to the infidel, the atheist, or the adherent of a non-Christian faith such as Islam or Judaism. It is settled law that no government official in this Nation may violate these fundamental constitutional rights regarding matters of conscience.” (internal quotation marks and citation omitted)).

. Though Henry II and Thomas Becket, as well as Henry VIII and Thomas More, explored the consequences of governmental direction to Church leaders and religious followers respecting their conformance with their Church’s directives, we Americans, since long before Lemon, have rejected what Madison called “intermeddling]” in church affairs. Lemon, 403 U.S. at 635, 91 S.Ct. 2105 (Douglas, J., concurring) (quoting James Madison, Memorial and Remonstrance Against *1058 Religious Assessments para. 11 (1785)); see also James Madison, Address to the Convention of Virginia (June 12, 1788), reprinted, in 3 The Debates in the Several State Conventions, On the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787 330 (Jonathan Elliot ed., 1888) ("There is not a shadow of right in the general government to intermeddle with religion. Its least interference with it, would be a most flagrant usurpation.”). In contrast to such intermeddling, the high school case about "Ave Maria” at graduation cited by Judge Silverman, Nurre v. Whitehead, 580 F.3d 1087 (9th Cir.2009), did not involve any attack on religion, just an avoidance of what might have appeared to be a governmental endorsement of religion. Id. at 1098-99.

. Edwards v. Aguillard, 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("State action violates the Establishment Clause if it fails to satisfy any of [the Lemon test] prongs.”).

. Lynch, 465 U.S. at 692, 104 S.Ct. 1355 (O'Connor, J., concurring).

. Id.

. Wallace v. Jaffree, 472 U.S. 38, 60, 105 S.Ct 2479, 86 L.Ed.2d 29 (1985).

. Cnty. of Allegheny v. ACLU, 492 U.S. 573, 574, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (quoting Lynch, 465 U.S. at 687, 104 S.Ct. 1355 (O’Connor, J., concurring)).

. See, e.g., The Laws and Liberties of Massachusetts 20 (Max Farrand ed., 1929) (1648) (requiring church attendance on the "Lords days” and any other days "as are to be generally kept by the appointment of Authoritie,” with anyone who violated this law being required to "forfeit for his absence from everie such publick meeting five shillings”).

. See Cnty. of Allegheny, 492 U.S. at 620, 109 S.Ct. 3086; Sch. Dist. of Grand Rapids v. Ball, 473 U.S. 373, 389, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985); Wallace, 472 U.S. at 61, 105 S.Ct. 2479.

.San Francisco is quite a metropolitan city, with many people coming from other countries than our own. Some of those countries persecute their religious minorities — including Christians. See Lolong v. Gonzales, 400 F.3d 1215, 1217-18, 1221-22 (9th Cir.2005) (describing how Christians are a persecuted minority in Indonesia), rev’d, 484 F.3d 1173 (9th Cir.2007) (en banc). An official resolution by a government in the United States condemning a Christian religious denomination would not put American Catholics in fear of a pogrom, but might put immigrants from some other countries in fear of what a government hostile to their church might someday do to them.

. West Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

. John Locke, A Letter Concerning Toleration 56 (James H. Tully ed., Hackett Publ'g Co. 1983) (1689).