**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 10, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

MUNEER AWAD,

     Plaintiff - Appellee,

v.

PAUL ZIRIAX, Agency Head, Oklahoma
State Board of Elections, THOMAS
PRINCE, Chairman of the Board,
Oklahoma State Board of Elections,
STEVE CURRY, Board Member,
Oklahoma State Board of Elections, and
JIM ROTH, Board Member, Oklahoma
State Board of Elections,

     Defendants - Appellants.

-----------------------------
FOUNDATION OF MORAL LAW; THE
ASSOCIATION OF THE BAR OF THE
CITY OF NEW YORK; THE ISLAMIC
LAW COMMITTEE OF THE
AMERICAN BRANCH OF THE
INTERNATIONAL LAW
ASSOCIATION, THE AMERICAN
JEWISH COMMITTEE, AMERICANS
UNITED FOR SEPARATION OF
CHURCH AND STATE, THE ANTI-
DEFAMATION LEAGUE, THE
BAPTIST JOINT COMMITTEE FOR
RELIGIOUS LIBERTY, THE CENTER
FOR ISLAMIC PLURALISM,
INTERFAITH ALLIANCE, AND THE

No. 10-6273

UNION FOR REFORM JUDAISM,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:10-CV-01186-M)**

---

Patrick R. Wyrick, Solicitor General (Scott D. Boughton and Janis Wood Preslar, Assistant Attorneys General, on the briefs), Office of the Attorney General of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellant.

Micheal Salem, Salem Law Offices, Norman, Oklahoma (Joseph Thai, Norman, Oklahoma; Gadeir Abbas, Council of American Islamic Relations, Washington, DC; and Daniel Mach and Heather L. Weaver, American Civil Liberties Union Foundation, Washington, DC, with him on the briefs), appearing for Appellee.

Roy S. Moore, Benjamin D. DuPre, and John Allen Eidsmoe, Montgomery, Alabama, filed an Amicus Curiae brief on behalf of the Foundation of Moral Law.

Robert E. Michael, Robert E. Michael & Associates, PLLC, New York, New York, filed an Amicus Curiae brief on behalf of Association of the Bar of the City of New York and the Islamic Law Committee of the American Branch of the International Law Association.

Craig C. Martin, Jenner & Block, LLP, Chicago, Illinois, and Joshua M. Segal, Jenner & Block, LLP, Washington, DC, filed an Amicus Curiae brief on behalf of American Jewish Committee; Americans United for Separation of Church and State; Anti-Defamation League; Baptist Joint Committee for Religious Liberty; Center for Islamic Pluralism; Interfaith Alliance; and Union for Reform Judaism.

---

Before **O'BRIEN**, **McKAY,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

On November 2, 2010, Oklahoma voters approved a proposed constitutional amendment that would prevent Oklahoma state courts from considering or using Sharia law. Before the amendment can become effective, the Oklahoma State Election Board must certify this election result. The Board members have asked us to review whether a federal district court abused its discretion when it granted a preliminary injunction to prevent them from certifying the result. We conclude there was no abuse of discretion.

## I. BACKGROUND

A. *Constitutional Amendments in Oklahoma*

We start with an explanation of the constitutional amendment process in Oklahoma and how its courts construe such amendments. The state constitution can be amended in several ways. *See* Okla. Const. art. 24. We focus on the process used in this case. Under article 24, section 1 of the Oklahoma Constitution,[1] the state legislature may

---

[1]This provision of the Oklahoma Constitution states:

> Any amendment or amendments to this Constitution may be proposed in either branch of the Legislature, and if the same shall be agreed to by a majority of all the members elected to each of the two (2) houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered in their journals and referred by the Secretary of State to the people for their approval or rejection, at the next regular general election, except when the Legislature, by a two-thirds (2/3) vote of each house, shall order a special election for that purpose. If a majority of all the electors voting on any proposed amendment at such election shall vote in favor thereof, it shall thereby become a part of this Constitution.

Continued . . .

pass a proposed constitutional amendment. The legislature also drafts a ballot title that explains the proposed amendment to voters. *See Sw. Bell Tel. Co. v. Okla. State Bd. of Equal.*, 231 P.3d 638, 642 (Okla. 2009).

The proposed amendment and ballot title are submitted to the Attorney General to ensure legal compliance. *Id.* The Attorney General must specify any defects "and, if necessary, . . . prepare a preliminary ballot title which complies with the law." 34 Okla. Stat. tit. 34, § 9(C) (2009).[2] Once certified by the Attorney General, the Secretary of

---

Cont.

> No proposal for the amendment or alteration of this Constitution which is submitted to the voters shall embrace more than one general subject and the voters shall vote separately for or against each proposal submitted; provided, however, that in the submission of proposals for the amendment of this Constitution by articles, which embrace one general subject, each proposed article shall be deemed a single proposal or proposition.

Okla. Const. art. 24, § 1.

[2]This law was amended slightly in 2011. We refer to the 2009 version of the law, which was in effect for the 2010 election. It stated in pertinent part:

> When a measure is proposed as a constitutional amendment by the Legislature or when the Legislature proposes a statute conditioned upon approval by the people:
>
> 1. After final passage of a measure, the Secretary of State shall submit the proposed ballot title to the Attorney General for review as to legal correctness. Within five (5) business days, the Attorney General shall, in writing, notify the Secretary of State, the President Pro Tempore of the Senate and the Speaker of the House of Representatives whether or

Continued . . .

State transmits the proposed measure and ballot title to the Election Board. *Sw. Bell*, 231 P.3d at 642.

A proposed constitutional amendment therefore "consist[s] of two substantive parts—the measure and the ballot title." *Id.* (quotations omitted). When the Oklahoma Supreme Court interprets a state constitutional amendment's meaning, it reads these parts together, regardless of whether there are "ambiguities or absurdities." *Id.* It considers the amendment's text and the ballot title together because "those who framed and adopted the amendment considered" both substantive parts. *Id.* "The understanding of

_____

Cont.

> not the proposed ballot title complies with applicable laws. The Attorney General shall state with specificity any and all defects found and, if necessary, within ten (10) business days of determining that the proposed ballot title is defective, prepare a preliminary ballot title which complies with the law and furnish a copy of such ballot title to the Secretary of State, the President Pro Tempore of the Senate and the Speaker of the House of Representatives. The Attorney General may consider any comments made by the President Pro Tempore of the Senate or the Speaker of the House of Representatives and shall file a final ballot title with the Secretary of State no sooner than ten (10) business days and no later than fifteen (15) business days after furnishing the preliminary ballot title; and
>
> 2. After receipt of the measure and the official ballot title, as certified by the Attorney General, the Secretary of State shall within five (5) days transmit to the Secretary of the State Election Board an attested copy of the measure, including the official ballot title.

34 Okla. Stat. tit. 34, § 9(C) (2009).

-5-

the Legislature as the framers and of the electorate as the adopters of the constitutional amendment is the best guide for determining an amendment's meaning and scope, and such understanding is reflected in the language used in the measure and the ballot title." *Id.*

Oklahoma law provides that the Election Board must certify election results before a constitutional amendment can take effect. *See* Okla. Const. art. 5, § 3; Okla. Stat. tit. 26, §§ 7-136, 12-118; *Fent v. Henry*, 257 P.3d 984, 986 (Okla. 2011). The State Election Board Rules provide that "[t]he State Election Board meets at 5 p.m. on Tuesday next following an election involving . . . state questions to certify the final election results." § 230:35-3-91(c).

## B. *The Proposed "Save Our State" Constitutional Amendment*

On May 25, 2010, the Oklahoma House of Representatives and Senate passed House Joint Resolution 1056 ("HJR 1056"). The resolution directed "the Secretary of State to refer to the people for their approval or rejection a proposed amendment to Section 1 of Article VII of the [Oklahoma] Constitution . . . [known as] the Save Our State Amendment." Aplt. App. Vol. 1 at 167. The proposed amendment states:

> The Courts provided for in subsection A of this section, when exercising their judicial authority, shall uphold and adhere to the law as provided in the United States Constitution, the Oklahoma Constitution, the United States Code, federal regulations promulgated pursuant thereto, established common law, the Oklahoma Statutes and rules promulgated pursuant thereto, and if necessary the law of another state of the United States *provided the law of the other state does not include Sharia Law*, in making judicial decisions. The courts

-6-

shall *not look to* the legal precepts of other nations or cultures. Specifically, the courts *shall not consider international law or Sharia Law*. The provisions of this subsection shall apply to all cases before the respective courts including, but not limited to, cases of first impression.

*Id.* at 168 (emphases added).

HJR 1056 also provided that the ballot title should state:

This measure amends the State Constitution. It would change a section that deals with courts of this state. It would make courts rely on federal and state laws when deciding cases. It would *forbid courts from looking at international law or Sharia Law* when deciding cases.

SHALL THE PROPOSAL BE APPROVED?

*Id.* at 169 (italic emphasis added).

The Oklahoma Attorney General determined that the proposed ballot title did "not comply with applicable laws." *Id.* at 175. It did "not adequately explain the effect of the proposition because it [did] not explain what either Sharia Law or international law is."

*Id.* The Attorney General prepared a revised ballot title, which states:

This measure amends the State Constitution. It changes a section that deals with the courts of this state. It would amend Article 7, Section 1. It makes courts rely on federal and state law when deciding cases. It forbids courts from considering or using international law. It *forbids courts from considering or using Sharia Law.*

International law is also known as the law of nations. It deals with the conduct of international organizations and independent nations, such as countries, states and tribes. It deals with their relationship with each other. It also deals with some of their relationships with persons.

The law of nations is formed by the general assent of civilized nations. Sources of international law also include international agreements, as well as treaties.

*Sharia Law is Islamic law. It is based on two principal sources, the Koran and the teachings of Mohammed.*[3]

**SHALL THE PROPOSAL BE APPROVED?**

*Id.* at 178-79 (italic emphases added). The Attorney General refrained from giving any opinion "on the merits or constitutionality of the underlying proposed changes in the law, [or] on the ability of federal law to preempt the changes in the law." *Id.* at 178.

This revised ballot title was placed on the ballot as State Question 755 ("SQ 755"). On November 2, 2010, just over 70 percent of Oklahoma voters approved SQ 755. Without intervention, the proposed amendment would likely have been certified on November 9, 2010. *See* Okla. State Board Election Rule § 230:35-3-91(c).

**C.** *Procedural History*

On November 4, 2010, Muneer Awad sued the members of the Oklahoma Election Board (collectively the "Appellants"). He sought to prevent certification of the SQ 755 election results. Mr. Awad, an American citizen residing in Oklahoma, is the executive director of the Oklahoma Chapter of the Council on American-Islamic Relations. As a Muslim, he adheres to the religious principles from the Koran and the teachings of Mohammed.

---

[3]Various spellings have been used for "Sharia," "Koran," and "Mohammed." We use the spellings adopted in the ballot title to avoid confusion.

Mr. Awad alleges that the Save Our State Amendment violates his rights under both the Establishment and Free Exercise Clauses of the First Amendment of the United States Constitution. He objects to the amendment's singling out his religion for negative treatment. He claims the amendment's implementation would cause multiple adverse consequences, such as stigmatizing him and others who practice the Muslim faith, inhibiting the practice of Islam, disabling a court from probating his last will and testament (which contains references to Sharia law), limiting the relief Muslims can obtain from Oklahoma state courts, and fostering excessive entanglement between the government and his religion.

The district court granted a temporary restraining order on November 9, 2010. On November 22, 2010, the court conducted an evidentiary hearing regarding Mr. Awad's request for a preliminary injunction. It granted the preliminary injunction one week later. *See Awad v. Ziriax*, 754 F. Supp. 2d 1298, 1308 (W.D. Okla. 2010). Appellants filed a timely notice of appeal on December 1, 2010.

Oral argument occurred before this panel on September 12, 2011. Following oral argument, the parties were asked to file simultaneous supplemental briefs to answer the following questions:

> 1. Should the test set forth in *Larson v. Valente*, 456 U.S. 228 (1982), govern the Establishment Clause issue in this case? *See also Hernandez v. Commissioner*, 490 U.S. 680 (1989); *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008). Why or why not?

2. How should the Establishment Clause issue be analyzed and decided under the *Larson* test, assuming it does apply?

The parties filed supplemental briefs on November 2, 2011.

We have jurisdiction under 28 U.S.C. § 1292(a)(1), which authorizes appellate review of a district court's interlocutory order granting a preliminary injunction.

## II. DISCUSSION

Appellants challenge the preliminary injunction. First, they argue that Mr. Awad's claims are not justiciable. Second, they argue that, even if Mr. Awad's Establishment or Free Exercise Clause claim is justiciable, each claim fails to meet preliminary injunction requirements.

We hold that Mr. Awad's Establishment Clause claim is justiciable and that the district court did not abuse its discretion in granting the preliminary injunction based on that claim. Because Mr. Awad's Establishment Clause claim provides sufficient grounds to uphold the preliminary injunction, we affirm without reaching Mr. Awad's Free Exercise claim.

### A. *Justiciability*

Appellants argue that Mr. Awad lacks standing and that his claims are not ripe for review. They have not distinguished between the justiciability of his Establishment and Free Exercise claims. Because we do not reach the Free Exercise claim, we address only the justiciability of Mr. Awad's Establishment Clause claim. "We review questions of

justiciability de novo." *Kansas Judicial Review v. Stout*, 519 F.3d 1107, 1114 (10th Cir. 2008).

## 1. *Mr. Awad Has Standing to Bring His Establishment Clause Claim*

To establish Article III standing, a plaintiff must establish (1) that he or she has "suffered an injury in fact;" (2) that the injury is "'fairly traceable to the challenged action of the defendant;" and, (3) that it is "likely" that "the injury will be redressed by a favorable decision." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011) (quotations omitted); *see also Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011). "At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007) (quotations omitted).

As in all standing analyses, we must begin by determining whether Mr. Awad has alleged an injury in fact. To satisfy this requirement, plaintiffs must allege they "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Winn*, 131 S. Ct. at 1442 (quotations omitted).

Appellants argue that Mr. Awad does not have standing because he has not

-11-

suffered an actual or imminent injury.[4]  They contend that because the amendment has

not taken effect or been interpreted by any Oklahoma court, Mr. Awad's alleged injuries

are necessarily speculative.  They further contend that Mr. Awad's assertion that he will

suffer official condemnation of his religion is "personal opinion."  Aplt. Br. at 14.

Mr. Awad claims that the amendment threatens to injure him in several ways, such

as condemning his Muslim faith, inhibiting the practice of Islam, disabling a court from

probating his will (which contains references to Sharia law), and limiting the relief he and

other Muslims can obtain from Oklahoma state courts.

Determining whether a plaintiff has alleged a sufficient injury in fact is often not

difficult.  But "the concept of injury for standing purposes is particularly elusive in

Establishment Clause cases."  *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 504-05

(5th Cir. 2007) (quotations omitted); *see also Suhre v. Haywood Cnty.*, 131 F.3d 1083,

1085 (4th Cir. 1997) (same quote); *Robinson v. City of Edmond*, 68 F.3d 1226, 1230 n.6

(10th Cir. 1995) ("Standing is of course always necessary in an Establishment Clause

case, and it is sometimes a difficult issue.").

The Supreme Court discussed this issue in *Valley Forge Christian College v.*

*Americans United for Separation of Church and State*, 454 U.S. 464 (1982).  In *Valley*

*Forge*, a group of plaintiffs dedicated to the separation of church and state attempted to

challenge the transfer of surplus federal property to an educational institution affiliated

---

[4]Appellants have not challenged the causation or redressability elements of Mr. Awad's standing.

with a particular religious order.  The plaintiffs learned about the conveyance through a press release.  None of them lived in or near Pennsylvania, the site of the property at issue.  The Court held that the plaintiffs did not have standing because they failed to identify a personal injury resulting from the allegedly unconstitutional transfer.  The Court noted that it was not enough for litigants to claim a constitutional violation.  Rather, plaintiffs must "identify a[] personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees."  *Id.* at 485 (emphasis in original).  The Court noted that it was "not retreat[ing] from [its] earlier holdings that standing may be predicated on noneconomic injury."  *Id.* at 486. [5]

Since *Valley Forge*, the Supreme Court has not provided clear and explicit guidance on the difference between psychological consequence from disagreement with government conduct and noneconomic injury that is sufficient to confer standing. [6]  Our

---

[5]This is consistent with our longstanding view that in Establishment Clause cases, "standing is clearly conferred by non-economic religious values." *Anderson v. Salt Lake City Corp.*, 475 F.2d 29, 31 (10th Cir. 1973) *superseded on other grounds by Van Orden v. Perry*, 545 U.S. 677 (2005); *McCreary Cnty. v. Am. Civil Liberties Union of Kentucky*, 545 U.S. 844 (2005).  *See Soc'y of Separationists v. Pleasant Grove City*, 416 F.3d 1239, 1241 n.1 (10th Cir. 2005).

[6]We have some direction, however, from the numerous cases in which the Court has addressed the merits of Establishment Clause claims alleging exposure to unwelcome government-sponsored religious messages.

Summarized in recent Seventh Circuit and Ninth Circuit opinions, these cases involved "a crèche in a county courthouse, a crèche in a public park, the Ten Commandments displayed on the grounds of a state capitol, the Ten Commandments

Continued . . .

court has addressed standing in the Establishment Clause context in several cases. For

example, in *O'Connor v. Washburn Univ.*, 416 F.3d 1216 (10th Cir. 2005), plaintiffs, a

college faculty member and a student, claimed their unwelcome exposure to a statue on

their campus that was allegedly hostile to their Catholic religion violated the

Establishment Clause. We held the plaintiffs had standing. We noted that "[i]n the

context of alleged violations of the Establishment Clause, this court has held that standing

is clearly conferred by non-economic religious values." *Id.* at 1222 (quotations omitted).

We explained, however, that "plaintiffs alleging non-economic injury must be 'directly

affected by the laws and practices against which their complaints are directed.'" *Id.* at

1222-23 (quoting *Valley Forge*, 454 U.S. at 486 n.22). We then concluded that

"[a]llegations of personal contact with a state-sponsored [religious] image suffice to

demonstrate this kind of direct injury." *Id.* at 1223.

---

Cont.

displayed at a courthouse, a cross displayed in a national park, prayer in a football game, school prayer, a moment of silence at school, Bible reading at a public school, and a religious invocation at graduation." *Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 812 (7th Cir. 2011) (Williams, J., concurring); *Catholic League for Religious and Civil Rights v. City and Cnty. of San Francisco*, 624 F.3d 1043, 1049-50 (9th Cir. 2010) (en banc), *cert. denied*, 131 S. Ct. 2875 (2011).

The Supreme Court recently cautioned that "[w]hen a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Arizona Christian Sch. Tuition Org. v. Winn*, — U.S. —, 131 S. Ct. 1436, 1448 (2011). Nonetheless, the volume and content of Supreme Court merits decisions in Establishment Clause religious display and expression cases involving noneconomic injury is instructive.

Our most recent Establishment Clause case to address standing was *American Atheists, Inc. v. Davenport*, 637 F.3d 1095 (10th Cir. 2010).  In that case, plaintiffs challenged the placement of crosses on government property in remembrance of fallen highway patrol troopers.  We concluded that the plaintiffs suffered an Establishment Clause standing injury because they encountered an unwelcome government-sponsored religious symbol.  We stated: "[A]llegations of personal contact with a state-sponsored image suffice to demonstrate . . . direct injury" for standing purposes in Establishment Clause cases.  *Id*. at 1113 (quotations omitted).

As in many Establishment Clause cases, the *American Atheists* plaintiffs did not suffer physical or economic injury.  Their alleged injury was "personal and unwelcome contact with the crosses."  *Id*. (quotations omitted).  We said "these allegations establish standing."  *Id.*  This basis for standing was the same as in other cases in which plaintiffs have challenged government-sponsored religious symbols.  *See, e.g., Foremaster v. City of St. George*, 882 F.2d 1485, 1490-91 (10th Cir. 1989).

Although standing remains difficult to define precisely in the Establishment Clause context, several key principles can be distilled from the above-referenced cases.  First, "[i]n the context of alleged violations of the Establishment Clause, . . . standing is clearly conferred by non-economic religious values."  *O'Connor*, 416 F.3d at 1222 (quotations omitted).  Second, it is not enough for litigants to claim a constitutional violation.  They must also "identify a[] personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence

-15-

presumably produced by observation of conduct with which one disagrees." *Valley Forge*, 454 U.S. at 485 (emphasis in original). Finally, alleging *only* "personal and unwelcome contact" with government-sponsored religious symbols is sufficient to establish standing. *American Atheists,* 637 F.3d at 1113 (quotations omitted). [7]

As in other Establishment Clause cases, Mr. Awad alleges that the amendment threatens him with noneconomic injuries. In some respects, Mr. Awad's alleged injuries are similar to those found sufficient to confer standing in our religious symbol Establishment Clause cases. Like the plaintiffs who challenged the highway crosses in *American Atheists*, Mr. Awad suffers a form of "personal and unwelcome contact" with an amendment to the Oklahoma Constitution that would target his religion for disfavored treatment. As a Muslim and citizen of Oklahoma, Mr. Awad is "directly affected by the law[] . . . against which [his] complaints are directed." *See Valley Forge*, 454 U.S. at 487 n.22 (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 224 n.9 (1963)). As further spelled out below, that is enough to confer standing. *See Schempp*, 374 U.S. at 224 n.9.

Mr. Awad alleges injuries beyond the "personal and unwelcome contact" that suffices for standing with religious symbols. He alleges that the amendment condemns his religious faith and exposes him to disfavored treatment. Such condemnation was not

---

[7]One of the *American Atheists* plaintiffs alleged that he was forced to alter his travel route to avoid contact with the crosses. We said that such an allegation was not necessary for standing but further supported his standing. 637 F.3d at 1113 (quoting *O'Connor v. Washburn Univ*., 416 F.3d 1216, 1223 (10thCir. 2005)).

present in the religious symbol cases. The plaintiffs in those cases certainly may have felt that a religious display conflicted with their religious beliefs or non-belief, but those symbols did not expressly target and condemn a specific religion. Mr. Awad alleges that the amendment condemns his religion and prohibits him from relying on his religion's legal precepts in Oklahoma courts, while not prohibiting people of all other faiths to rely on the legal precepts of their religions.[8]

Mr. Awad's alleged injury goes significantly beyond a "psychological consequence" from disagreement with observed government conduct, *see Valley Forge*, 454 U.S. at 485, "hurt feelings" from a presidential proclamation requesting citizens to pray, *Freedom from Religion Found. Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011), or "a person's deep and genuine offense to a defendant's actions," *Catholic League for*

---

[8]In a case that did not involve the Establishment Clause, *Allen v. Wright*, 468 U.S. 737 (1984), plaintiffs, parents of black school children, sued the Internal Revenue Service for failure to enforce a law to deny tax-exempt status to private schools that discriminated on the basis of race. The Court denied that the plaintiffs' claim of a stigmatizing injury suffered by all members of a racial group was sufficient for standing because the injury was too generalized and did not allege personal denial of equal treatment:

> There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action *and is sufficient in some circumstances to support standing*. Our cases make clear, however, that such injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.

*Id.* at 755 (quotations and citation omitted) (emphasis added). Here, Mr. Awad's injury is personal and concrete.

-17-

*Religious and Civil Rights v. City and Cnty. of San Francisco*, 624 F.3d 1043, 1062 (9th Cir. 2010) (en banc) (Graber, J., dissenting), *cert. denied*, 131 S. Ct. 2875 (2011). The harm alleged by Mr. Awad stems from a constitutional directive of exclusion and disfavored treatment of a particular religious legal tradition.

The district court seemed to rely in part on the Ninth Circuit's decision in *Catholic League* to confer standing on Mr. Awad. *See Awad*, 754 F. Supp. 2d at 1303. We do not rely on *Catholic League*, although our standing holding is consistent with that case, and the contrast between the two cases illustrates the strength of Mr. Awad's standing. In *Catholic League*, the court upheld plaintiffs' standing to challenge a non-binding San Francisco Board of Supervisors resolution denouncing a Catholic Church position on homosexual adoptions. 624 F.3d at 1046-53. In this case, the Oklahoma Legislature did not simply adopt a non-binding resolution opposing the consideration or use of Sharia law in state courts, it proposed and the electorate agreed to enshrine such a prohibition in the state's constitution. Mr. Awad is facing the consequences of a statewide election approving a constitutional measure that would disfavor his religion relative to others. The non-binding city resolution in *Catholic League* conveyed "a government message," 624 F.3d at 1048. The Oklahoma amendment conveys more than a message; it would impose a constitutional command.

We conclude that Mr. Awad's allegation—that the proposed state amendment *expressly* condemns his religion and exposes him and other Muslims in Oklahoma to disfavored treatment—suffices to establish the kind of direct injury-in-fact necessary to

-18-

create Establishment Clause standing.

Because the amendment would likely have been certified a week after it was passed, we further conclude that the injury alleged by Mr. Awad is imminent and not conjectural or hypothetical. *See* Okla. State Election Board Rule § 230:35-3-91(c) (noting that the State Election Board meets on the Tuesday following an election to certify final election results on state questions); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 345 (2006) (defining "imminent" injury as one that is "certainly impending" (quotations omitted)).

Additionally, we agree with the district court that "plaintiff has shown that his alleged injuries are fairly traceable to the challenged action of defendants and are likely to be redressed by a favorable decision." *Awad*, 754 F. Supp. 2d at 1304. Mr. Awad therefore has standing to bring his Establishment Clause claim.[9]

### 2. *The Establishment Clause Claim Is Ripe For Review*

We also conclude that Mr. Awad's Establishment Clause claim is ripe for review. The ripeness doctrine aims to prevent courts "from entangling themselves in abstract disagreements" by avoiding "premature adjudication." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Ripeness reflects constitutional considerations that implicate Article III

---

[9]Appellants have not challenged Mr. Awad's prudential standing, nor do we discern any issues on that ground. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004).

limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1767 n.2 (2010) (quotations omitted). Our ripeness analysis focuses on "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Stout*, 519 F.3d at 1116 (quotations omitted).

"'[I]f a threatened injury is sufficiently "imminent" to establish standing, the constitutional requirements of the ripeness doctrine will necessarily be satisfied.'" *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1154 (10th Cir. 1999) (quoting *Nat'l Treasury Emp. Union v. United States*, 101 F.3d 1423, 1428 (D.C. Cir. 1996)). Thus, for the reasons discussed in our injury-in-fact standing analysis, we hold that Mr. Awad meets the constitutional ripeness requirement.

Appellants challenge whether Mr. Awad's claims are prudentially ripe. We analyze prudential ripeness by "examining both the fitness of the issues raised . . . for judicial review and the hardship to the parties from withholding review." *United States v. Vaquera-Juanes*, 638 F.3d 734, 736-37 (10th Cir. 2011), *cert. denied*, 132 S. Ct. 315 (2011).

First, on fitness, we "focus[] on whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Stout*, 519 F.3d at 1118. We must decide if "prudential limitations . . . require us to stay our hand until the issues in the case have become more fully developed." *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1098 (10th Cir. 2006).

Mr. Awad challenges the facial validity of the proposed amendment under the First Amendment. Such claims are generally considered to be strictly legal questions that do "not involve the application of [the law] in a specific factual setting." *Stout*, 519 F.3d at 1118 (quotations omitted); *see also ACORN v. City of Tulsa, Okla.*, 835 F.2d 735, 740 (10th Cir. 1987) ("In determining the facial validity of a statute or ordinance the court does not consider any specific type of conduct. Rather, the facial validity of a statute is decided by reference to all of the conduct that is proscribed by the statute."). The constitutional validity of the proposed amendment in this case does not require us to evaluate specific factual context. Further factual development is therefore unnecessary to our resolution of the preliminary injunction factors. This matter is fit for judicial review.

Second, as for hardship from withholding judicial review, we ask "whether the challenged action creates a direct and immediate dilemma for the parties." *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (quotations omitted). Appellants plainly suffer no hardship from withholding review. But Mr. Awad has shown he faces an immediate and concrete condemnation injury if we withhold review and the measure is certified. Mr. Awad thus faces a "direct and immediate dilemma" and has established the necessary hardship to overcome prudential ripeness concerns. *Id*.

We conclude this matter is ripe for review. Because Mr. Awad also has standing, we hold that his Establishment Clause claim is justiciable.

**B. *Preliminary Injunction***

Having concluded that Mr. Awad's claim is justiciable, we now address whether the district court abused its discretion by granting the preliminary injunction. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). "An abuse of discretion occurs only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Wilderness Workshop v. United States Bureau of Land Mgmt.*, 531 F.3d 1220, 1223-24 (10th Cir. 2008) (quotations omitted).

To obtain a preliminary injunction, Mr. Awad must show that four factors weigh in his favor: "(1) [he] is substantially likely to succeed on the merits; (2) [he] will suffer irreparable injury if the injunction is denied; (3) [his] threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009); *see also* Fed. R. Civ. P. 65; *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

Appellants argue that Mr. Awad is seeking a disfavored type of injunction and that he should therefore be subject to a more strenuous preliminary injunction test. There are three types of disfavored injunctions:

> (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. When a preliminary injunction falls into one of these categories, it must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is

-22-

extraordinary even in the normal course. A district court may not grant a preliminary injunction unless the moving party makes a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms.

*Summmum v. Pleasant Grove City*, 483 F.3d 1044, 1048-49 (10th Cir. 2007), *rev'd on other grounds*, 555 U.S. 460 (2009) (quotations omitted); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975-76 (10th Cir. 2004) (en banc), *aff'd and remanded by*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006).

The district court applied the heightened standard because it found the preliminary injunction altered the status quo and afforded all the relief Mr. Awad could recover after a merits trial. *See Awad*, 754 F. Supp. 2d at 1305. Although Mr. Awad argues on appeal that the district court should have applied the less demanding traditional standard, we need not decide that issue because we affirm that Mr. Awad meets the heightened standard. The following therefore reviews the preliminary injunction under that standard, which calls for Mr. Awad to make "a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Summum*, 483 F.3d at 1049. The heightened standard does not affect the analysis of the other two preliminary injunction factors: irreparable injury and public interest. *See id.* Mr. Awad need only show that those two factors weigh in his favor.

We examine each preliminary injunction factor.

**1.** *A Strong Showing of Likelihood of Success on the Merits*

-23-

The first factor is likelihood of success on the merits. Under the heightened standard, Mr. Awad must make a strong showing that he is likely to succeed on his Establishment Clause claim. We first determine the proper Establishment Clause test and then apply it to the facts to see if Mr. Awad has satisfied this burden.

### a. *Determining the Proper Legal Test*

The First Amendment provides in part that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. Like other First Amendment provisions, the Establishment Clause is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Green v. Haskell Cnty. Bd. of Com'rs*, 563 F.3d 784, 796 (10th Cir. 2009).

To decide whether the district court abused its discretion in holding that Mr. Awad is likely to prevail on the merits, we must first determine the proper Establishment Clause test. There are two possibilities—the *Lemon* or *Larson* test.[10] *See Larson v. Valente*, 456

---

[10]"Although the Supreme Court is sharply divided" on whether *Lemon* remains valid law, this court "has recently affirmed that the touchstone for Establishment Clause analysis remains the tripartite test set out in *Lemon*." *Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1117 (10th Cir. 2010), *cert. denied*, *Utah Highway Patrol Ass'n v. Am. Atheists Inc.*, 132 S. Ct. 12 (2011); *see also Green*, 568 F.3d at 798 n.8. An important distinction between *American Atheists* and this case is that the former involved religious symbols and not a law discriminating among religions. *See Am. Atheists*, 637 F.3d at 1112.

To withstand an Establishment Clause challenge under the *Lemon* test, a provision must (1) "have a secular legislative purpose;" (2) have a "primary effect" that "neither

Continued . . .

U.S. 228, 255 (1982); *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  The Supreme

Court instructs that *Lemon* applies to "laws affording uniform benefit to *all* religions, and

not to provisions . . . that discriminate *among* religions."  *Larson*, 456 U.S. at 252

(emphases in original).

The *Larson* test provides that if a law discriminates among religions, it can survive

only if it is "closely fitted to the furtherance of any compelling interest asserted."  *Id.* at

255. [11]  Strict scrutiny is required when laws discriminate among religions because

"[n]eutral treatment of religions [is] 'the clearest command of the Establishment

Clause.'"  *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008)

(quoting *Larson*, 456 U.S. at 244)).  "The First Amendment mandates governmental

neutrality between religion and religion . . . .  The State may not adopt programs or

practices . . . which aid or oppose any religion . . . .  This prohibition is absolute."

*Larson*, 456 U.S. at 246 (quotations omitted).

Appellants argue that *Larson* is either no longer valid or does not fit the facts of

_____

Cont.

advances or inhibits religion;" and (3) "not foster an excessive government entanglement
with religion."  *Lemon*, 403 U.S. at 612-13 (quotations omitted).

[11]In *Larson*, the court found the appellants failed to demonstrate that the provision
at issue was closely fitted to further a compelling governmental interest.  *Larson*, 456
U.S. at 251.  It then considered the provision under *Lemon*, but asserted that step was
unnecessary:  "Although application of the *Lemon* tests is not necessary to the disposition
of the case before us, those tests do reflect the same concerns that warranted the
application of strict scrutiny."  *Id.* at 252.

this case.  We disagree on both counts.  Appellants surmise that *Larson* is no longer good law in part because it has been used infrequently.  But the Supreme Court has never overturned it.  Moreover, *Larson*'s rare use likely reflects that legislatures seldom pass laws that make "explicit and deliberate distinctions between different religious organizations" as contemplated in *Larson.  Id.* at 247 n.23; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993) ("The principle that government may not enact laws that suppress religious belief or practice is so well understood that few violations are recorded in our opinions.").

The Supreme Court and various circuits, including this one, have referenced or applied the *Larson* test.  *See, e.g.*, *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 695 (1989) (*Larson* teaches that . . . the initial inquiry is whether the law facially discriminates among religions.  If no such facial preference exists, we proceed to apply the . . . [*Lemon* test]."); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) ("But *Larson* indicates that laws discriminating *among* religions are subject to strict scrutiny." (emphasis in original)); *Lynch v. Donnelly*, 465 U.S. 668, 687 n.13 (1984); *Colorado Christian Univ.*, 534 F.3d at 1266; *Sklar v. Comm'r of Internal Revenue*, 549 F.3d 1252, 1257 n.3, 1265-67 (9th Cir. 2008); *Children's Healthcare Is a Legal Duty, Inc. v. Min De Parle*, 212 F.3d 1084, 1090 (8th Cir. 2000); *Koenick v. Felton*, 190 F.3d 259, 264 (4th Cir. 1999); *Wilson*

*v. N.L.R.B.*, 920 F.2d 1282, 1286-87 (6th Cir. 1990).[12]  In *Colorado Christian University*, we stated:  "statutes involving discrimination on the basis of religion, including interdenominational discrimination, are subject to heightened scrutiny . . . under the . . . Establishment Clause."  534 F.3d at 1266 (citing *Larson*, 456 U.S. at 246).[13]

Because the district court applied *Lemon* without determining if *Larson* should apply, *see Awad*, 754 F. Supp. 2d at 1305-06, we asked for supplemental briefing on this issue and on the appropriate outcome under *Larson.*  Having considered the parties' arguments and the record, we conclude that *Larson* is the proper test for determining if the proposed amendment violates the Establishment Clause.[14]

---

[12]The *Larson* test can be seen as "the Establishment Clause counterpart to the rule against content discrimination . . . in free speech law . . . [both requiring] strict scrutiny." John H. Garvey, *The Architecture of the Establishment Clause*, 43 Wayne L. Rev. 1451, 1463 (1997).  The *Larson* test can also be seen as an Establishment Clause counterpart to the Equal Protection Clause in that both "provide[] constitutional protection against religious discrimination."  Fred Mark Gedicks, *The Permissible Scope of Legal Limitations on the Freedom of Religion or Belief in the United States*, 19 Emory Int'l L. Rev. 1187, 1189-90 (2005); *see also, e.g.*, *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951) ("The right to equal protection of the laws, in the exercise of those freedoms of speech and religion protected by the First and Fourteenth Amendments, has a firmer foundation than the whims of personal opinions of a local governing body.").

[13]In *Colorado Christian University,* we acknowledged uncertainty as to what level of scrutiny should apply when discriminatory funding is at issue, *see id.* at 1267, but the proposed Save Our State Amendment is not about funding.

[14]Although the district court applied *Lemon* instead of *Larson*, we need not remand when, as here, the record is sufficiently developed to allow us to determine whether Mr. Awad has met his burden under the four preliminary injunction factors. *See Summum*, 483 F.3d at 1049 ("[T]he District Court abused its discretion by analyzing Summum's First Amendment claim under the incorrect legal standard.  But rather than

Continued . . .

The *Larson* test applies because the proposed amendment discriminates among religions. This case presents even stronger "explicit and deliberate distinctions" among religions than the provision that warranted strict scrutiny in *Larson*. *See Larson*, 456 U.S. at 247 n.23. *Larson* involved a Minnesota statute that imposed certain registration and reporting requirements upon only those religious organizations that solicited more than 50 percent of their funds from nonmembers. *Id.* at 230. Unlike the provision in *Larson*, the Oklahoma amendment specifically names the target of its discrimination. The only religious law mentioned in the amendment is Sharia law, which is defined in SQ 755 in religious terms: "Sharia Law is Islamic law. It is based on two principal sources, the Koran and the teachings of Mohammed." Aplt. App. Vol. 1 at 179.

Appellants argue there is no discrimination because the amendment bans all religious laws from Oklahoma courts and Sharia law is named only as an example. But that argument conflicts with the amendment's plain language, which mentions Sharia law in two places.

First, the amendment instructs Oklahoma courts to "uphold and adhere to . . . if

---

Cont.

remaining to the District Court for the appropriate analysis, we find the record sufficiently developed to allow us to determine whether Summum has met its burden under the four factors necessary to prevail on its motion." (citing *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1261 (10th Cir. 2005); *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1075-76 (10th Cir. 2001))). "[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Herman v. Pollock*, 586 F.3d 1254, 1259 (10th Cir. 2009) (quotations omitted).

necessary the law of another state of the United States *provided the law of the other state does not include Sharia Law*, in making judicial decisions." *Id.* at 168 (emphasis added). This language prohibits Oklahoma courts from upholding and adhering to laws of other states that include Sharia law but does not prohibit Oklahoma courts from upholding and adhering to laws of other states that include the laws of any other religion. On this basis alone, application of *Larson* strict scrutiny is warranted.

Second, the amendment states that Oklahoma "courts shall not look to the legal precepts of *other* nations or cultures. Specifically, the courts shall not consider international law or Sharia Law." *Id.* (emphasis added). Appellants argue that the word "cultures" should be read to include religious groups, and that the amendment therefore "plainly prohibits the consideration of legal precepts associated with *all* religious denominations." Aplt. Supp. Br. at 7. We disagree.

The amendment bans only one form of religious law—Sharia law. Even if we accept Appellants' argument that we should interpret "cultures" to include "religions," the text does not ban all religious laws. The word "other" in the amendment modifies both "nations" and "cultures." Therefore, if we substituted the word "religions" for "cultures," the amendment would prohibit Oklahoma courts from "look[ing] to the legal precepts of *other* . . . religions." The word "other" implies that whatever religions the legislature considered to be part of domestic or Oklahoma culture would not have their legal precepts prohibited from consideration, while all others would. Thus, the second portion of the amendment that mentions Sharia law also discriminates among religions.

-29-

Because the amendment discriminates among religions, it is "suspect," and "we apply strict scrutiny in adjudging its constitutionality." *Larson*, 456 U.S. at 246.

### b. *Applying* **Larson's** *Strict Scrutiny*

To survive strict scrutiny under *Larson*, Appellants must show (1) a compelling government interest, and (2) that the amendment is "closely fitted" to that compelling interest. *See id.* at 246-47.

We pause here to clarify the burdens each party carries at this stage in the litigation. To succeed in his quest for a preliminary injunction under the heightened standard, Mr. Awad assumes the burden of making a strong showing that he is likely to succeed on the merits. *See Summum*, 483 F.3d at 1049. However, "burdens at the preliminary injunction stage track the burdens at trial." *O Centro Espirita*, 546 U.S. at 429 ("[A]s the Government bears the burden of proof on the ultimate question of the challenged Act's constitutionality . . . the movants must be deemed likely to prevail unless the Government has shown that [the strict scrutiny test is met]." (quotations omitted)). Therefore, if Appellants fail to carry their burden of showing a compelling interest and closely fitted means, Mr. Awad will have succeeded in carrying his burden of making a strong showing of likelihood of success on the merits.

### i. *Compelling State Interest*

We first consider whether Appellants have asserted a compelling interest. For an interest to be sufficiently compelling to justify a law that discriminates among religions, the interest must address an identified problem that the discrimination seeks to remedy.

-30-

*See Brown v. Entm't Merch. Ass'n*, 131 S. Ct. 2729, 2738 (2011). Appellants must identify an actual concrete problem—"[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980); *see also Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 644 (1994) (plurality) ("[The government] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.").

Supreme Court case law instructs that overly general statements of abstract principles do not satisfy the government's burden to articulate a compelling interest. For example, in *Brown*, the Supreme Court insisted that "[t]he State must specifically identify an actual problem in need of solving . . . ." 131 S. Ct. at 2738 (quotations omitted). Similarly, in *Watchtower Bible Tract Society of New York, Inc. v. Village of Strauss*, 536 U.S. 150 (2002), the Court rejected the government's asserted general interest of crime prevention in part because "there is an absence of any evidence of a special crime problem related to [the challenged discriminatory law] in the record before us." *Id.* at 169.

The supplemental briefing order asked how the Establishment Clause issue should be analyzed and decided under the *Larson* test. Appellants provided only one sentence on compelling interest. They simply assert that "Oklahoma certainly has a compelling interest in determining what law is applied in Oklahoma courts." Aplt. Supp. Br. at 16.

Oklahoma's asserted interest is a valid state concern. But this general statement

alone is not sufficient to establish a *compelling* interest for purposes of this case. Appellants do not identify any *actual problem* the challenged amendment seeks to solve. Indeed, they admitted at the preliminary injunction hearing that they did not know of even a single instance where an Oklahoma court had applied Sharia law or used the legal precepts of other nations or cultures, let alone that such applications or uses had resulted in concrete problems in Oklahoma. *See Awad*, 754 F. Supp. 2d at 1308; Aplt. App. Vol. 1 at 67-68.

Given the lack of evidence of any concrete problem, any harm Appellants seek to remedy with the proposed amendment is speculative at best and cannot support a compelling interest.[15] "To sacrifice First Amendment protections for so speculative a gain is not warranted . . . ." *Columbia Broad. Sys., Inc. v. Democratic Nat'l Co.*, 412 U.S. 94, 127 (1973).

Because Appellants have failed to assert a compelling interest, they have failed to satisfy strict scrutiny. Mr. Awad has therefore made a strong showing that he is likely to prevail in a trial on the merits.

_____

[15]Even if Appellants could identify a problem of sufficient importance to constitute a compelling interest, under strict scrutiny they still must demonstrate that their stated justification is the *actual* purpose for the proposed amendment and not a "rationalization[] for actions in fact differently grounded." *United States v. Virginia*, 518 U.S. 515, 535-36 (1996) (citing *Weisenburger v. Wiesenfeld*, 420 U.S. 636, 648 n.16 (1975)). Indeed, this court has emphasized that "[w]e cannot and will not uphold a statute that abridges an enumerated constitutional right on the basis of a factitious governmental interest found nowhere but in the defendants' litigating papers." *Colorado Christian Univ.*, 534 F.3d at 1268-69.

### ii. *"Closely Fitted"*

Without a compelling interest based on an actual problem, the second step of the strict scrutiny analysis—whether there is a close fit with a compelling state interest—is unnecessary and not feasible. *See Larson*, 456 U.S. at 246-47. It is unnecessary because both a compelling interest and a close fit are required to survive strict scrutiny. *See id.* It is not feasible because we have no concrete problem or compelling interest to try to fit with the Save Our State Amendment. One cannot try on a glove to see if it fits when the glove is missing.

Nonetheless, we make the following observation about the "close-fit" or "narrowly tailored" step of strict scrutiny. *See Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (explaining that strict scrutiny's narrow tailoring requirement measures whether there is a close fit between the means chosen and the compelling interest). The proposed amendment goes further than preventing courts from "applying" Sharia law. The amendment forbids state courts from "considering" those laws. *See* Aplt. App. Vol. 1 at 168. Even if the state could identify and support a reason to single out and restrict Sharia law in its courts, the amendment's complete ban of Sharia law is hardly an exercise of narrow tailoring. Appellants have not carried their burden to show why the proposed amendment is "closely fitted" to a compelling interest. *See Brown*, 131 S. Ct. at 2738 (explaining that the government assumes the burden to demonstrate a restriction "is narrowly drawn to serve" a compelling interest). Mr. Awad therefore has made a strong showing that he is likely to succeed on the merits.

### 2. *Mr. Awad Has Shown He Will Suffer Irreparable Injury If the Injunction Is Denied*

The second factor is whether irreparable injury is likely without the injunction. *See Winter*, 555 U.S. at 20. For the same reasons presented in the standing portion of this opinion, we disagree with the Appellants' argument that Mr. Awad faces no injury if the injunction is denied. However, the question here is not just whether Mr. Awad faces a concrete and imminent injury, but whether such an injury will be irreparable without the injunction.

"A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). Furthermore, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quotations omitted).

"Damages would be inadequate or difficult to ascertain," *Dominion Video Satellite*, 269 F.3d at 1156, for a claim of government condemnation of one's religion. Mr. Awad has alleged that if the Oklahoma amendment takes effect, he will suffer such a condemnation injury in violation of constitutional rights. The district court did not abuse its discretion in holding that Mr. Awad is likely to face irreparable injury absent an injunction. *See Awad*, 754 F. Supp. 2d at 1307.

### 3. *Mr. Awad Has Made a Strong Showing that his Threatened Injury Outweighs the Injury the Appellants Will Suffer Under the Injunction*

The third factor concerns the balance of harms. Under the heightened standard of review, Mr. Awad must make a strong showing that his threatened injury outweighs any injury to Appellants caused by granting the injunction. *See Summum*, 483 F.3d at 1049. Appellants argue that the balance weighs in their favor because Oklahoma voters have a strong interest in having their politically expressed will enacted, a will manifested by a large margin at the polls. But when the law that voters wish to enact is likely unconstitutional, their interests do not outweigh Mr. Awad's in having his constitutional rights protected. *See Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 699 (9th Cir. 1997)

As the Ninth Circuit explained, when a law that voters have approved "affronts the federal Constitution—the Constitution which the people of the United States themselves ordained and established—the court merely reminds the people that they must govern themselves in accordance with the principles of their choosing." *Id.*; *see also Williams v. Rhodes*, 393 U.S. 23, 29 (1968) ("[T]he Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution.").

Appellants admitted at the preliminary injunction hearing that they did not know of any instance where an Oklahoma court had applied Sharia law or used the legal precepts of other nations or cultures. *See Awad*, 754 F. Supp. 2d at 1308; Aplt. App. 157-58. Delayed implementation of a measure that does not appear to address any immediate

-35-

problem will generally not cause material harm, even if the measure were eventually found to be constitutional and enforceable.

We hold that the district court did not abuse its discretion in deciding that Mr. Awad made a strong showing that his threatened injury outweighed any potential harm to Appellants in granting the injunction. *See Awad*, 754 F. Supp. 2d at 1308.

**4. *Mr. Awad Has Shown the Injunction Would Not Be Adverse to the Public Interest***

The last factor is whether the preliminary injunction would not be adverse to the public interest. *See Beltronics*, 562 F.3d at 1070. Appellants argue that the preliminary injunction interferes with Oklahomans' fundamental right to vote, prevents enactment of the voters' will, and "discourages the voters from participating in the election process." Aplt. Reply Br. at 14.

Federal courts should be wary of interfering with the voting process, but we agree with the district court and the Sixth Circuit that "'it is always in the public interest to prevent the violation of a party's constitutional rights.'" *Awad*, 754 F. Supp. 2d at 1308 (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). "While the public has an interest in the will of the voters being carried out . . . the public has a more profound and long-term interest in upholding an individual's constitutional rights." *Id.*; *see also Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983) (noting "[t]he strong public interest in protecting First Amendment values").

We therefore hold that the district court did not abuse its discretion in determining that the preliminary injunction was not adverse to the public interest. *See Awad*, 754 F. Supp. 2d at 1308.

\*\*\*

We conclude that the district court did not abuse its discretion in holding that each of the preliminary injunction factors weighed in favor of Mr. Awad's request and that he made a strong showing on the substantial likelihood and balance-of-harms factors as the heightened standard requires. We hold that the district court did not abuse its discretion in granting the preliminary injunction.[16]

## III.    CONCLUSION

Because Mr. Awad has at least one justiciable claim and because the district court did not abuse its discretion in granting the preliminary injunction, we affirm.

---

[16]Appellants raised the issue of severability of the Sharia law portions of the amendment for the first time to this court in post-oral argument supplemental briefing. Their argument consisted of one sentence and cited no authority, stating that if this court decides the Sharia law provisions in the amendment render the amendment invalid, "the court should simply treat the explicatory example as surplusage, and strike it." Because this issue has not been adequately briefed, we do not address it. *See United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) ("It is well-settled that arguments inadequately briefed in the opening brief are waived." (quotations omitted)).