Emmanuel **TEMPLE**, The House of Praise; Carl E. Harris; Lighthouse Outreach Center Assembly of God; Joe Hunkin, Jr., Plaintiffs,

v.

Neil **ABERCROMBIE**, in his official capacity as Governor of the State of Hawaii; Loretta J. Fuddy, in her official capacity as Director of Health of the State of Hawaii; State of Hawaii, Defendants.

Civ. No. 11–00790 JMS–KSC.

United States District Court, D. Hawai'i.

Oct. 2, 2012.

Shawn A. Luiz, Honolulu, HI, for Plaintiffs.

John F. Molay, Office of the Attorney General–State of Hawaii, Honolulu, HI, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DISMISSING ACTION

J. MICHAEL SEABRIGHT, District Judge.

## I. INTRODUCTION

This action challenges the constitutionality of Hawaii's Civil Unions Law, 2011 Haw. Sess. L. Act 1 ("Act 1") codified at Hawaii Revised Statutes ("HRS") Ch.

572B (the "Civil Unions Law"), which became effective on January 1, 2012. Plaintiffs Emmanuel Temple, the House of Praise ("Emmanuel Temple"); Carl E. Harris ("Harris"); Lighthouse Outreach Center Assembly of God; and Joe Hunkin, Jr. ("Hunkin") (collectively "Plaintiffs") filed the action under 42 U.S.C. § 1983 on December 28, 2011, seeking declaratory and prospective injunctive relief to prevent Defendants Neil Abercrombie, in his official capacity as Governor of the State of Hawaii ("Abercrombie"); and Loretta J. Fuddy, in her official capacity as Director of Health of the State of Hawaii (collectively "Defendants") from "any conduct violating the Plaintiff's (sic) rights[.]" Doc. No. 1, Compl. ¶ 19(b). Plaintiffs' Complaint primarily alleges that Act 1 is unconstitutional because it does not exempt religious organizations from being subject to Hawaii public accommodations laws "for refusing to rent their facilities for same sex unions and/or marriage ceremonies." *Id.* ¶¶ 13–14.

On December 30, 2011, the court denied Plaintiffs' Motion for Temporary Restraining Order ("TRO") which sought to prevent Act 1 from being implemented and enforced. *See Emmanuel Temple, House of Praise v. Abercrombie*, 2011 WL 6935321, at *1 (D.Haw. Dec. 30, 2011). The court denied the Motion for TRO because the action was not justiciable—whether analyzed in terms of standing or ripeness, there was no "case or controversy" as necessary for this court to have jurisdiction to reach the constitutionality of Act 1. *Id.* at *4. By agreement of the parties, the court subsequently stayed the action while the 2012 Hawaii Legislature considered amendments to the Civil Unions Law. On July 6, 2012, Abercrombie signed Act 267, 2012 Haw. Sess. L. ("Act 267") relating to Civil Unions. Among other measures, Act 267 amended HRS Ch. 572B to add an exemption for religious organizations that refuse to make facilities available for solemnizing civil unions. Defendants now move to dismiss the action.

Based on the following, the Motion to Dismiss is GRANTED. The current Complaint is moot because Act 267 amended the Civil Unions Law, and the Complaint was not amended to reflect the statutory change. More important, granting leave to amend (to revise the Complaint to challenge the current version of the Civil Unions Law) would be futile because the action would remain nonjusticiable. Whether gauged in relation to the current Complaint or an amended complaint, conditions for justiciability have not changed since the denial of the Motion for TRO. Plaintiffs have not demonstrated that they have standing or that the action is ripe. Accordingly, the action is DISMISSED without prejudice for lack of subject matter jurisdiction.

## II. BACKGROUND

### A. Factual Background

Plaintiffs' Complaint alleges violations of the First, Fifth, and Fourteenth Amendments to the United States Constitution. Plaintiffs contend that Act 1 violates the Constitution because Act 1 does not specifically exempt religious organizations from Hawaii's anti-discrimination laws (*e.g.*, HRS Ch. 489—Discrimination in Public Accommodations).[1] According to the

---

1. In particular, HRS § 489–3 provides:
   Unfair discriminatory practices that deny, or attempt to deny, a person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation on the basis of race, sex, including gender identity or expression, sexual orientation, color, religion, ancestry, or disability are prohibited.
   In turn, HRS § 489–7.5(a) provides a private cause of action for violations, as follows:
   Any person who is injured by an unlawful discriminatory practice, other than an un-

Complaint, Act 1 and actions by the Hawaii Civil Rights Commission have a "chilling effect on Plaintiffs' free exercise of religion," as "Plaintiffs are [or were] immediately subject to the imminent threat of Civil Rights Complaints upon Act 1 taking effect[.]" Doc. No. 1, Compl. ¶ 19.

The Complaint alleges that Emmanuel Temple is a domestic, nonprofit corporation whose purposes are to advance and promote the worship of God; to engage in and promote the study of the Holy Scriptures; and to advance the gospel of Jesus Christ. Harris is a Bishop and Pastor of Emmanuel Temple. Likewise, Lighthouse Outreach Center Assembly of God is a domestic, nonprofit corporation whose purposes are to worship the Lord, and to conduct activities such as Sunday school, outreach programs, and day care. *Id.* ¶ 4.

During the proceedings on the Motion for TRO, Harris provided a declaration dated December 26, 2011 explaining the allegations of harm that Plaintiffs believed they faced at that time. (The court relies on the factual allegations of the Complaint and on the record created during the Motion for TRO proceedings to analyze whether the entire action is justiciable.[2]) In particular, Harris attested that he opposes Act 1 because same sex marriage and civil unions are against the teachings of the gospel of Jesus Christ. Doc. No. 4–1, Harris Decl. ¶¶ 3, 4. He stated that he is aware of instances in "New Jersey, California, and Hawaii" where religious institutions and churches have refused to rent their properties to others for civil unions and receptions, and have thus been subject to civil rights complaints. *Id.* ¶ 6. No specific details of those instances were provided. He further attested that he was "aware that this year [2011], the Hawaii Civil Rights Commission accepted a complaint from a same sex couple against a church which refused to rent its property for a same sex couple to perform a same sex marriage." *Id.* ¶ 7. He stated:

> [b]ecause of my stance regarding same-sex unions and marriages, I am under imminent and immediate threat commencing on January 1, 2012 of being

lawful discriminatory practice under part II of this chapter, may:

    (1) Sue for damages sustained, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorneys' fees together with the costs of suit; and

    (2) Bring proceedings to enjoin the unlawful discriminatory practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorneys' fees together with the cost of suit.

And HRS § 489–8 provides for imposition of penalties for violations in actions brought by the Hawaii Attorney General or Hawaii Civil Rights Commission, as follows:

    (a) It shall be unlawful for a person to discriminate unfairly in public accommodations.

    (b) Any person, firm, company, association, or corporation who violates this part shall be fined a sum of not less than $500 nor more than $10,000 for each violation, which sum shall be collected in a civil action brought by the attorney general or the civil rights commission on behalf of the State. The penalties provided in this section shall be cumulative to the remedies or penalties available under all other laws of this State. Each day of violation under this part shall be a separate violation.

**2.** In responding to the present Motion challenging the court's subject matter jurisdiction, Plaintiffs submitted no factual information. Rather, Plaintiffs responded with additional legal argument and caselaw. *See* Doc. No. 23, Pls.' Opp'n at 5. Thus, the court relies on the allegations of the Complaint and the evidence in the record. As was the situation when the Motion for TRO was filed, the court has no indication that any couples seeking to solemnize a civil union have sought to utilize Plaintiffs' facilities, much less that authorities are specifically seeking to enforce public accommodations laws against Plaintiffs for refusing to make facilities available to couples.

investigated; incurring attorneys fees and costs in defending my religious liberties; being enjoined and fined by the Hawaii Civil Rights Commission for refusing to rent my facilities to same sex couples.

*Id.* ¶ 8.

Among other provisions, the Civil Unions Law details who may solemnize a civil union. HRS § 572B–4(b), as amended by Act 267, allows judges who may "legally join persons in chapter 572 or a civil union" to solemnize civil unions. It also allows "[a]ny minister, priest, or officer of any religious denomination or society who has been ordained or is authorized to solemnize civil unions according to the usages of such denomination or society, or any religious society not having clergy but providing solemnization in accordance with the rules and customs of that society" to solemnize a civil union. *Id.* And the Civil Unions Law specifically provides that such authorized persons are not required to solemnize civil unions and are not subject to fines, penalties, or other civil actions if they refuse, for any reason, to join persons in a civil union. HRS § 572B–4(c). The Civil Unions Law thus contains "immunity" from fines, penalties, or civil actions if a pastor, such as Harris, refuses to perform a civil union.

Prior to its amendment by Act 267, however, the Civil Unions Law did not contain similar immunity if a church or other religious organization refused—on the basis that it is opposed to civil unions—to rent or otherwise allow use of its facilities for performing civil unions or hosting receptions celebrating a civil union. Based on that (prior) lack of immunity, the Complaint and corresponding Motion for TRO sought to prevent implementation of Act 1 and the Complaint still seeks prospective injunctive relief to enjoin Defendants from enforcing Hawaii anti-discrimination laws against Plaintiffs, given Plaintiffs' stated

intention to refuse (if asked) to make their facilities available to those who might seek to use them for performing or celebrating civil unions.

As mentioned above, Act 267 was signed into law on July 6, 2012 and, among other provisions, amended the Civil Unions Law to add a specific section providing immunity for religious organizations that refuse to make their facilities available for solemnizing civil unions. In particular, Act 267 added HRS § 572B–9.5, which provides:

(a) A religious organization shall not be required to make a religious facility owned or leased by the religious organization available for solemnization of a civil union; provided that:

(1) The religious facility is regularly used by the religious organization for its religious purposes;

(2) For solemnization of marriages pursuant to chapter 572, the religious organization restricts use of the religious facility to its members; and

(3) The religious organization does not operate the religious facility as a for profit business.

(b) A religious organization that refuses to make a religious facility available for solemnization of a civil union under subsection (a) shall not be subject to any fine, penalty, or civil liability for the refusal.

(c) Nothing in this section shall be interpreted to exempt the owner or operator of any religious facility from the requirements of chapter 489 if the religious facility is a place of public accommodation as defined in section 489–2.

Act 267 § 3. Notably, Act 267 was made retroactive to January 1, 2012 (with two exceptions not at issue here). *Id.* § 20.

The Complaint was not amended to reflect the passage of Act 267, nor to indicate definitively that Plaintiffs are challenging

the constitutionality of § 572B–9.5 or of any other aspect of the now-revised Civil Unions Law. The court thus addresses the current version of the Complaint, but infers from argument that Plaintiffs still seek to challenge the amended version of the Civil Unions Law.

## B. Procedural Background

Plaintiffs filed their Complaint and Motion for TRO on December 28, 2011. The court denied the Motion for TRO on December 30, 2011, Doc. No. 12, and the action was stayed on January 19, 2012. Doc. No. 15. After Act 267 was signed into law, Plaintiffs indicated at a July 19, 2012 status conference that they intended to pursue this action. On July 27, 2012, Defendants filed their Motion to Dismiss. Plaintiffs filed their Opposition on August 31, 2012, and a Reply was filed on September 4, 2012. The court heard the Motion to Dismiss on October 1, 2012.

## III. *STANDARD OF REVIEW*

■ Under Article III § 2 of the Constitution, this court's subject matter jurisdiction is limited to deciding "cases" or "controversies." *See, e.g., Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). No case or controversy exists if a plaintiff lacks standing or if a case is not ripe for adjudication, *see, e.g., Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc), and consequently a federal court lacks subject matter jurisdiction. *See, e.g., White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000) (reiterating that "standing ... pertain[s] to a federal court's subject-matter jurisdiction under Article III"); *St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.1989) ("Whether a claim is ripe for adjudication goes to a court's subject matter jurisdiction under the case or controversy clause of article III of the federal Constitution.").

■ Thus, a motion to dismiss for lack of standing or ripeness is a motion under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. "Such a motion may either attack the allegations of the complaint as insufficient to confer subject-matter jurisdiction upon the court, or attack the existence of subject-matter jurisdiction in fact." *Baker v. Castle & Cooke Homes Hawaii, Inc.,* 2012 WL 1454967, at *3 (D.Haw. Apr. 25, 2012) (citing *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004)). "When the motion to dismiss attacks the allegations of the complaint as insufficient to confer subject-matter jurisdiction—a facial challenge—all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Id.* (citing *Fed'n of African Am. Contractors v. City of Oakland,* 96 F.3d 1204, 1207 (9th Cir.1996)). But "[w]hen the motion to dismiss is a factual attack on subject-matter jurisdiction, no presumption of truth attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the existence of subject-matter jurisdiction in fact." *Id.* (citing *Safe Air for Everyone,* 373 F.3d at 1039).

## IV. *DISCUSSION*

■ The court must first determine whether it has subject-matter jurisdiction. *See, e.g., Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *see also Bernhardt v. Cnty. of L.A.,* 279 F.3d 862, 868 (9th Cir.2002) ("[F]ederal courts are required sua sponte to examine jurisdictional issues such as standing.") (citation omitted). In so doing, the court determines whether Plaintiffs' challenge is justiciable, as this court's "role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the

powers granted the judiciary in Article III of the Constitution." *Thomas,* 220 F.3d at 1138. Justiciability includes the doctrines of mootness, ripeness, and standing, *see, e.g., Culinary Workers Union, Local 226 v. Del Papa,* 200 F.3d 614, 617 (9th Cir. 1999) (observing that Article III's case or controversy "justiciability limitations are reflected in the doctrines of standing, mootness, and ripeness")—and all three doctrines are implicated here, as analyzed to follow.

## A. The Complaint Is Moot

■ Initially, the factual basis of the Complaint as pled no longer exists. Because Act 267 amended the Civil Unions Law retroactively to add an immunity provision—the absence of which formed the primary basis of the alleged constitutional infirmity of Act 1—the Complaint as written no longer constitutes a live controversy. In short, the Complaint is moot. *See, e.g., Montana Wilderness Ass'n, Nine Quarter Circle Ranch v. U.S. Forest Serv.,* 655 F.2d 951, 958 (9th Cir.1981) ("[A]n attack on a statute will be mooted by new legislation which eliminates the aspects of the old law which gave rise to the challenge.") (citations omitted); *Chem. Producers & Distribs. Ass'n v. Helliker,* 463 F.3d 871, 875 (9th Cir.2006) ("Where intervening legislation has settled a controversy involving only injunctive or declaratory relief, the controversy has become moot.") (quoting *Bunker Ltd. P'ship v. United States,* 820 F.2d 308, 311 (9th Cir.1987)).[3]

Despite the pleading deficiency, Plaintiffs' argument indicates that they now seek to challenge the constitutionality or adequacy of Act 267's key amendment (the new immunity provision in HRS § 572B–9.5)—they briefly contend that "[t]he limited exemption of Act 1, as amended, fails to satisfy the First Amendment by placing three conditions precedent for a church needing to meet before being able to utilize the limited exemption." Doc. No. 23, Pls.' Opp'n at 7. Such a challenge, however, would require an Amended Complaint that references the specific provisions of Act 267.

The court thus next addresses whether Plaintiffs should be given leave to amend their Complaint to challenge the revised provisions of the Civil Unions Law. *See, e.g., Lacey v. Maricopa Cnty.,* 693 F.3d 896, 926 (9th Cir.2012) (reiterating that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts") (citation omitted).

## B. Further Amendment Is Futile—Doctrines of Ripeness and Standing

In denying Plaintiffs' Motion for TRO on December 30, 2011, the court analyzed the threshold principles of justiciability (ripeness and standing) that must be satisfied before it could address the merits of Plaintiffs' constitutional challenge, and found that the action was not justiciable at that

---

**3.** An exception to mootness might apply "where a repeal or amendment is part of a bad faith attempt by the government to avoid judicial review or where the government has enacted a substantially similar law[.]" *Get Outdoors II, LLC v. City of Chula Vista,* 407 F.Supp.2d 1172, 1178 (S.D.Cal.2005) (citing *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990); *Princeton Univ. v. Schmid,* 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982); and *Diffenderfer v. Cent. Baptist Church, Inc.,* 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972)). This exception does not apply. Plaintiffs have made no attempt to demonstrate bad faith, and the record reveals no indication that the Hawaii Legislature intends to repeal Act 267's amendments. And, in this regard, Act 267's immunity provision is certainly not "substantially similar" to Act 1, which lacked such a provision.

time. *See Emmanuel Temple*, 2011 WL 6935321, at *1. The court reiterates those justiciability principles here, drawing upon its prior Order Denying the Motion for TRO. Ultimately, the court concludes that further amendment would be futile because Plaintiffs have not demonstrated that the situation facing them is any more justiciable now than it was nine months ago. That is, even if their Complaint was amended to challenge Act 267, Plaintiffs still lack standing to challenge it (or, stated alternatively, such a challenge is still not ripe).

■ Keeping in mind that leave to amend is freely given under Federal Rule of Civil Procedure 15(a)(2), it would be futile to allow an amended complaint that lacks subject matter jurisdiction. *See, e.g., Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir.2009) (reiterating that "futility of amendment alone can justify the denial of a motion [to amend]") (citing *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir.2004)). If Plaintiffs would lack standing to bring an amended complaint, the court need not "prolong the litigation by permitting further amendment." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1088 (9th Cir. 2002) (affirming trial court's denial of leave to amend where plaintiffs could not cure a lack of standing in their pleading).

### 1. Ripeness/Standing Principles [4]

■ The ripeness doctrine avoids "premature adjudication" of disputes. *Scott v. Pasadena Unif. Sch. Dist.*, 306 F.3d 646, 662 (9th Cir.2002). Where, as here, Plaintiffs challenge a law before it might be enforced—a "pre-enforcement challenge"—the claim is "only ripe if a plaintiff is presented with 'the immediate

dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation.'" *San Luis & DeltaMendota Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir.2011) (quoting *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993)). A court examines (1) "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question;" (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings;" and (3) "the history of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139; *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1021–22 (9th Cir.2012) (applying the *Thomas* factors); *Cal. Tow Truck Ass'n v. City & Cnty. of S.F.*, 693 F.3d 847, 865–66 (9th Cir.2012) (same).

■ "Constitutional challenges based on the First Amendment present unique standing considerations." *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). "In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Id.* That is, a plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143, n. 29, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). But, "when plaintiffs seek to establish standing to challenge a law or regulation that is not presently being enforced against them, they must demonstrate 'a realistic danger

---

**4.** "The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact

prong." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir.2000) (en banc).

of sustaining a direct injury as a result of the statute's operation or enforcement.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154 (9th Cir.2000) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)); *see also Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir.2010) (stating that even when plaintiffs challenge a restriction on the grounds that it may chill their First Amendment rights, they must still satisfy the "rigid constitutional requirement that plaintiffs must demonstrate an injury in fact to invoke a federal court's jurisdiction." (quoting *Dream Palace v. Cnty. of Maricopa*, 384 F.3d 990, 999 (9th Cir. 2004))). "[N]either the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Thomas*, 220 F.3d at 1139. "As the Supreme Court observed in *Pennell* [*v. City of San Jose*, 485 U.S. 1, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988),] 'application of the constitutional standing requirement [is not] a mechanical exercise.'" *Carrico v. City & Cnty. of S.F.*, 656 F.3d 1002, 1007 (9th Cir.2011) (quoting *Pennell*, 485 U.S. at 7, 108 S.Ct. 849). "In other words, context matters." *Id.*

### 2. Application—the Action Is Not Justiciable

Considering (1) the allegations of the Complaint, (2) the amendments to the Civil Unions Law in Act 267, (3) the factual information in the record, and (4) the nature and timing of the Plaintiffs' specific challenge—the action is not justiciable now and would not be justiciable if an amended complaint was filed. The court thus lacks subject matter jurisdiction. *See White*, 227 F.3d at 1242; *St. Clair*, 880 F.2d at 201.[5]

■ In applying *Thomas'* three-part test, the court first considers whether Plaintiffs have articulated a concrete plan to violate the law in question. And in considering this factor, "[a] general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan." *Thomas*, 220 F.3d at 1139. *Thomas* concluded that several landlords' future intent not to rent apartments to unmarried couples in violation of Alaska law was insufficiently concrete: "The landlords' expressed 'intent' to violate the law on some uncertain day in the future—if and when an unmarried couple attempts to lease one of their rental properties—can hardly qualify as a concrete plan." *Id.* at 1140.

■ Likewise, in this case, any threat of enforcement and imposition of fines by government officials (*e.g.*, the Hawaii Attorney General or the Hawaii Civil Rights Commission) under HRS § 489–8 for violating the Civil Unions Law is highly speculative. No one has asked Plaintiffs to use their facilities for a civil union. No one has inquired about such use in the days following Act 1's effective date. And, the record contains no indication that, in the nine months since its implementation, any couple has sought to use Plaintiffs' facilities in relation to solemnizing a civil union. Plaintiffs cannot say when and under what circumstances such a request might be made, if ever. Although they suggest that they will refuse to make their facilities available if asked, it remains speculative when, to whom, and under circumstances that might occur. Moreover, there is no indication that HRS § 572B–9.5 would not apply to provide immunity from enforcement of HRS § 489–8 if Plaintiffs refused.

**5.** The conclusion is the same whether the Motion is construed as a facial or factual challenge to subject matter jurisdiction. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.2004) (explaining the types of challenges to jurisdiction under Rule 12(b)(1)).

In other words, whether Plaintiffs would face "a realistic danger of sustaining a direct injury as a result of" enforcement of § 489–8, is "wholly contingent upon the occurrence a number of unforseeable events[.]" *Thomas*, 220 F.3d at 1141. First, a couple would have to ask Plaintiffs to use a particular facility of theirs for a civil union made possible by the Civil Unions Law.[6] Second, Plaintiffs would wrongly have to refuse a request based upon a protected ground. A facility would also have to fail to fulfill the conditions set forth in HRS § 572B–9.5. Next, the couple, having been denied such a request, would have to file a complaint with the Hawaii Civil Rights Commission under HRS § 489–6 or otherwise notify authorities of alleged discrimination. Finally, such authorities would then have to decide to proceed against Plaintiffs. None of this has occurred, and without some indication of the parameters of such a hypothetical violation (*e.g.*, the nature of the request, the proposed use, the circumstances of a denial), a " 'dispute is not justiciable, because it is not ripe for court review.' " *Thomas*, 220 F.3d at 1141 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998)).[7] *See also Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir.2010) (stating that to present a justiciable controversy, the plaintiff must assert more than "a wholly speculative possibility" of enforcement); *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir.2010) (stating, in the context of prudential ripeness, that a claim is not ripe for adjudication if it rests on

future contingent events); Erwin Chemerinsky, *Federal Jurisdiction* § 2.4.1 (5th ed. 2007) ("Specifically, the ripeness doctrine seeks to separate matters that are premature for review because the injury is speculative and may never occur, from those cases that are appropriate for federal court action.").

During the TRO proceedings, Plaintiffs pointed to HRS § 489–7.5, which provides a private cause of action for persons injured by an unlawful discriminatory practice in a public accommodation. Under this section, caselaw indicates an injured party may file a civil action for a violation *without* first seeking administrative relief with the Hawaii Civil Rights Commission. *See The Epileptic Found. v. City & Cnty. of Maui*, 300 F.Supp.2d 1003, 1017 n. 35 (D.Haw.2004) ("[A] plaintiff injured in violation of chapter 489 may either bring a civil action pursuant to § 489–7.5 or seek administrative relief."). Again, however, a genuine threat of enforcement (by a private party) against Plaintiffs would be contingent on several events beyond Plaintiffs' control: a couple would have to ask, they would have to be denied, immunity under HRS § 572B–9.5 would have to be insufficient, and the couple would then have to file suit.

Moreover, if the alleged discrimination victims filed suit on their own (without resort to assistance from government authorities such as the Hawaii Attorney General or Hawaii Civil Rights Commission), such private action would raise other justiciability concerns. *See Associated Or. Indus. v. Avakian*, 2010 WL 1838661,

---

6. As noted in the court's Order Denying the Motion for TRO, this fact, by itself, is highly speculative. Plaintiffs do not even attempt to explain why a same-sex couple would legitimately desire to solemnize a civil union on a premises owned or operated by an entity clearly hostile to same-sex couples.

7. Although Harris states that he is aware that in 2011 the Hawaii Civil Rights Commission accepted a complaint brought by a same sex couple against a church that refused to rent its property for a same sex couple to perform a same sex marriage, Doc. No. 4–1, Harris Decl. ¶ 7, the possible application of such a complaint—with no other details—is entirely speculative to the present dispute.

at *5 (D.Or. May 6, 2010) (reasoning that court was "aware of no case permitting a plaintiff to preemptively challenge the right of a private actor to bring a private cause of action before that cause of action has arisen"). *Avakian* examined standing and ripeness in a pre-enforcement, First Amendment context, and reiterated that a " 'relaxed approach to justiciability' is appropriate '*only* upon a showing that the plaintiff is immediately in danger of sustaining a direct injury as a result of an *executive or legislative* action.' " *Id.* (citation omitted). Plaintiffs are seeking to enjoin enforcement of laws such as HRS § 489–7.5 based upon a position they might be put in under the Civil Unions Law. In this hypothetical situation, then, a complaint would be seeking to enjoin a private actor from enforcing a facially-valid statute (HRS Ch. 489). *See Bronson v. Swensen,* 500 F.3d 1099, 1110 (10th Cir.2007) ("It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision.") (citations omitted).

As to *Thomas'* second prong, there are also no "*specific* warning or threat to initiate proceedings" by authorities. *Thomas,* 220 F.3d at 1139 (emphasis added). Although the record indicates that the Hawaii Civil Rights Commission (during the 2011 legislative session) opposed the granting of broad immunity for religious organizations from anti-discrimination laws, such testimony is not a specific warning or threat against Plaintiffs to impose penalties for a hypothetical violation. Indeed,

the 2012 Legislature *granted* religious organizations immunity for non-public accommodations.

Next, given that the Civil Unions Law is new, the last *Thomas* inquiry—history of past enforcement—"has little weight in [the court's] analysis." *Wolfson,* 616 F.3d at 1060. In this context, there is no history of enforcement of the Civil Unions Law. Indeed, Plaintiffs have provided no indication that it has been the basis of *any* enforcement action in the nine months since its enactment. Accordingly, this third prong of *Thomas* also indicates the action is not ripe.

### 3. Plaintiffs' "Non Economic" Injury Is Insufficient to Confer Standing

██ Despite the *Thomas* factors clearly weighing against them, Plaintiffs argue that they are injured by the Civil Unions Law because they (Harris and Hunkin) "suffer personal and unwelcome contact with a State law[.]" Doc. No. 23, Pls.' Opp'n at 6. They contend that the Civil Unions Law "condemns their particular faith while allowing other faiths which freely allow same-sex couples to use their property to hold civil union ceremonies to be subjected to no legal consequences." *Id.* at 7. Plaintiffs rely on *Awad v. Ziriax,* 670 F.3d 1111 (10th Cir.2012), in which the Tenth Circuit held that an Oklahoma resident had Article III standing to bring an Establishment Clause claim challenging an amendment to the Oklahoma Constitution that would have forbidden Oklahoma state courts from considering "Sharia law" in making judicial decisions. *Id.* at 1117–18.[8]

The plaintiff in *Awad* was an American citizen residing in Oklahoma affiliated with

---

**8.** "Sharia" is defined by one source as "Islamic law based on the Koran." *See* www.merriam-webster.com/dictionary/sharia (last visited Oct. 2, 2012). Similarly, another authority defines "Sharia" as

Islamic canonical law based on the teachings of the Koran and the traditions of the Prophet (Hadith and Sunna), prescribing

both religious and secular duties and sometimes retributive penalties for lawbreaking. It has generally been supplemented by legislation adapted to the conditions of the day, though the manner in which it should be applied in modern states is a subject of dispute between Muslim traditionalists and reformists.

the Oklahoma Chapter of the Council on American–Islamic Relations. *Id.* at 1119. He was of the Muslim faith, which adheres to religious principles of the Koran. *Id.* He challenged the impending certification of an amendment to Oklahoma's Constitution that Oklahoma voters had passed by ballot in a November 2010 election. The proposed "Save Our State" amendment would have changed a section of the Oklahoma Constitution regarding state courts so as to forbid its courts from "considering or using" "international law or Sharia Law" in making decisions. *Id.* at 1118. The Tenth Circuit held that the plaintiff had standing to challenge implementation of that provision because he suffered "a form of 'personal and unwelcome contact' with an amendment to the Oklahoma Constitution that would target his religion for disfavored treatment." *Id.* at 1122. The amendment expressly condemned his religious faith and exposed him and other Muslims to disfavored treatment by "enshrin[ing] ... a prohibition in the state's constitution." *Id.* at 1123. He had alleged that the amendment "condemns his religion and prohibits him from relying on his religion's legal precepts in Oklahoma courts[.]" *Id.*[9] He was "facing the consequences of a ... constitutional measure that would disfavor his religion relative to others." *Id.* And the Tenth Circuit carefully distinguished plaintiff's injury from a mere "psychological consequence presumably produced by observation of conduct with which one disagrees," which does not confer standing. *Id.* at 1122 (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

*Awad* is distinguishable. Nothing in the Civil Unions Law targets a specific religion. Nothing in the Civil Unions Law "condemns" Harris' or Hunkin's religion. Nothing in the Civil Unions Law mentions any religion. At most, Harris' and Hunkin's "personal and unwelcome contact with a State law," Doc. No. 23, Pls.' Opp'n at 6, rises to a "psychological consequence ... produced by observation of conduct with which one disagrees." *Valley Forge Christian Coll.,* 454 U.S. at 485, 102 S.Ct. 752. Such a consequence "is not an injury sufficient to confer standing under Art. III." *Id.* In short, this action is not justiciable.

## V. CONCLUSION

The Motion to Dismiss is GRANTED. The current Complaint is moot. Granting leave to amend would be futile because the action is not presently justiciable. The action is dismissed without prejudice. *See Ass'n of Am. Med. Colls. v. United States,* 217 F.3d 770, 785 (9th Cir.2000) (modifying a dismissal of an unripe claim to a dismissal without prejudice because events may later progress "to a point where plaintiffs' claims are ripe"); *Frontline Processing Corp. v. First State Bank of Eldorado,* 389 Fed.Appx. 748, 754 (9th Cir.2010) (holding that a district lacking subject matter jurisdiction over unripe counterclaims was required to dismiss them without prejudice). The Clerk of Court shall close the case file and enter Judgment in favor of Defendants.

IT IS SO ORDERED.

http://english.oxforddictionaries.com/definition/sharia (last visited Oct. 2, 2012).

9. The plaintiff had, for example, alleged that the amendment's implementation would have "disabl[ed] a court from probating his last will and testament (which contains references to Sharia law), limiting the relief Muslims can obtain from Oklahoma state courts[.]" *Awad v. Ziriax,* 670 F.3d 1111, 1119 (10th Cir.2012).